******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# CCT COMMUNICATIONS, INC. v.
# ZONE TELECOM, INC.*
## (SC 19574)

Rogers, C. J., and Palmer, Eveleigh, McDonald,
Espinosa, Robinson, and D'Auria, Js.**

*Syllabus*

The plaintiff, a telecommunications company, sought to recover damages for, inter alia, breach of contract in connection with the provision of certain equipment, software and services to the defendant for the operation of a telecommunications switch room. The parties had executed an agreement in 2006 pursuant to which the defendant purchased a digital signal circuit from the plaintiff and agreed to pay certain enumerated rates for long-distance telephone service, subject to a minimum monthly usage charge. In order to fulfill its duties under the agreement, the plaintiff purchased certain long-distance telephone service from G Co., which the plaintiff then resold to the defendant. Subsequently, a dispute developed between the plaintiff and G Co. over the plaintiff's failure to stay current with its payments and certain service problems. In January, 2007, G Co. notified the plaintiff that, if these problems were not resolved, it would terminate the plaintiff's service. Thereafter, the defendant requested the plaintiff's assistance in resolving certain service issues and, on January 26, 2007, G Co. terminated the plaintiff's service. The plaintiff then filed a voluntary bankruptcy petition and, following the issuance of certain automatic stays in connection with the bankruptcy proceeding, G Co. restored service to the plaintiff. On February 5, 2007, the defendant notified the plaintiff that it was terminating their agreement pursuant to an ipso facto clause in the agreement, which purported to allow termination in the event that either party filed a voluntary bankruptcy petition. The plaintiff claimed that, because the bankruptcy proceeding had stayed the termination of service by G Co., the defendant continued to be obligated under the agreement to either use the plaintiff's services or to pay the minimum monthly usage charge. Ultimately, the circuit used to route the defendant's long-distance calls under the agreement was rendered inoperable. The bankruptcy court subsequently dismissed the plaintiff's bankruptcy petition and, in doing so, declined to retain jurisdiction over the adversarial claims between the plaintiff and the defendant, noting, inter alia, that those claims primarily involved questions of state law. The plaintiff subsequently brought the present action, alleging breach of contract for the defendant's failure to pay certain amounts owed under the parties' agreement. The defendant filed a counterclaim alleging breach of contract based on the plaintiff's failure to provide certain services and seeking, inter alia, a judgment declaring that the defendant's termination of the agreement on February 5, 2007, was valid and effective. The trial court rendered judgment for the defendant on the plaintiff's complaint and on the defendant's breach of contract and declaratory judgment counterclaims. The trial court concluded that federal law did not preclude the defendant from exercising its right to terminate the agreement under the ipso facto clause and that the plaintiff had breached the agreement when it filed for bankruptcy. On appeal, the plaintiff claimed, inter alia, that the trial court incorrectly determined that the plaintiff had breached the agreement when it filed for bankruptcy and that the defendant had effectively exercised its right to terminate the agreement. *Held*:

1. This court declined to affirm the trial court's judgment on the alternative ground that that the plaintiff had breached the parties' agreement by failing to provide adequate service prior to the receipt of the defendant's notice of termination; the trial court's memorandum of decision, without additional findings, was insufficient to support a finding of breach on the basis of the plaintiff's failure to provide adequate service, in light of the court's repeated finding of breach based on the bankruptcy filing, the court's avoidance of any express finding of breach on the basis of the failure to provide adequate service, certain provisions in the agreement requiring the defendant to provide notice and an opportunity to cure

* ...

service issues, and certain testimony by the defendant's chief financial officer.

2. The trial court incorrectly concluded that the plaintiff's act of filing for bankruptcy constituted a material breach that permitted the defendant to terminate the agreement: the plain language of the ipso facto clause in the parties' agreement provided only an option for the nondebtor party to terminate the agreement following a bankruptcy petition if it so desired; furthermore, the trial court incorrectly determined that the defendant's termination of the agreement under the ipso facto clause was valid on the ground that the common-law ride-through doctrine provided an exception to the federal statute (11 U.S.C. § 365 [e]) barring enforcement of ipso facto clauses, this court having concluded that the ride-through doctrine did not apply because the plaintiff's bankruptcy petition was dismissed before confirmation of a reorganization plan, a debtor that seeks reorganization under the federal bankruptcy statutes need not assume an executory contract in order to avail itself of the protections afforded by 11 U.S.C. § 365 (e), and the ride-through doctrine does not operate to retroactively validate a previous, ineffective termination that had been initiated during bankruptcy proceedings; moreover, the defendant could not prevail on its claim that the trial court's judgment should be affirmed on the alternative ground that the parties' agreement fell within a statutory (11 U.S.C. § 556) exception to 11 U.S.C. § 365 (e) for commodity forward contracts, the trial court having correctly determined that the agreement was not subject to that exception because the defendant had failed to demonstrate that telecommunication services are actively traded or resold like other commodities, there was no indication that the defendant had entered into the agreement primarily as a hedge against fluctuations in the price of long-distance telephone services, the agreement did not specify a particular quantity of goods to be delivered on a particular date, it was not clear that the services at issue were truly fungible, and the agreement involved, inter alia, the sale of noncommodities to the defendant, namely, equipment.

Argued November 7, 2016—officially released November 21, 2017

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Danbury, where the defendant filed a counterclaim; thereafter, the case was transferred to the judicial district of Waterbury, Complex Litigation Docket, and tried to the court, *Agati*, *J.*; judgment for the defendant on the complaint and in part for the defendant on the counterclaim, from which the plaintiff appealed; subsequently, the court granted the defendant's application for attorney's fees and costs, and the plaintiff filed an amended appeal. *Reversed*; *further proceedings.*

*Joseph K. Scully*, with whom was *Jeffrey P. Mueller*, for the appellant (plaintiff).

*William M. Murphy*, for the appellee (defendant).

*Opinion*

EVELEIGH, J. The plaintiff, CCT Communications, Inc., appeals from the judgment of the trial court rendered in favor of the defendant, Zone Telecom, Inc.,[1] on the plaintiff's complaint and the defendant's counterclaim for damages and declaratory judgment. The case arises from a purchase agreement entered into by the parties in which the plaintiff was to provide various equipment, software, and services to the defendant for a telecommunications switch room located in Los Angeles, California. On appeal, the plaintiff claims that the trial court incorrectly rendered judgment in favor of the defendant on the plaintiff's complaint and the defendant's counterclaim. Specifically, the plaintiff asserts that the trial court incorrectly (1) concluded that it breached the purchase agreement by filing a petition for bankruptcy protection under chapter 11 of the United States Bankruptcy Code (bankruptcy code); see 11 U.S.C. § 1101 et seq. (2012); (2) determined that a letter from the defendant dated February 5, 2007, was an effective exercise of the defendant's right to terminate the purchase agreement, (3) failed to award the plaintiff certain damages on count one of its complaint, and (4) awarded the defendant damages, costs, and attorney's fees in excess of a limitation of liability clause in the purchase agreement. We agree that the trial court incorrectly concluded that the plaintiff's bankruptcy petition constituted a breach of the purchase agreement and permitted the defendant to terminate that agreement.[2] We therefore reverse the judgment of the trial court.

The following facts and procedural history, as found by the trial court and supplemented by the undisputed facts contained within the record, are relevant to our resolution of this appeal. The defendant provides long-distance telephone and other telecommunications services to independent local exchange carriers, which in turn sell the services to commercial and residential end users. In 2005, the plaintiff began providing various equipment, software, and services for use in the defendant's switch room.

By September, 2006, the relationship between the parties had begun to deteriorate. Following a heated meeting and further communications, the plaintiff, represented by its president, Dean Vlahos, and the defendant, represented by its senior vice president, Daniel Boynton, and its then vice president and chief legal counsel, Eamon Egan, ultimately agreed to continue to do business together on a restructured basis. The parties' new relationship was memorialized in the purchase agreement, which became effective on November 1, 2006. This is the operative legal document governing the present dispute.

A third, nonparty entity, Global Crossing Telecommu-

nication, Inc. (Global), also was involved in the activities that underlie this case. Global supplies long-distance telephone service, including national and international long-distance calling as well as toll-free service, to commercial resellers. When a customer contracts for Global's services, calls made under that contract are run through a level three digital signal circuit (circuit), which is capable of carrying a large volume of telephone calls. The consumer normally purchases a circuit as part of an agreement to use Global's long-distance services and rates.

Under the purchase agreement, the plaintiff essentially acted as a middle man, buying Global's long-distance services and reselling them to the defendant. Prior to the purchase agreement, the plaintiff owned a circuit that was located in the defendant's switch room. Under the purchase agreement, the plaintiff sold that circuit to the defendant.[3] This circuit enabled clients of the defendant to place calls through Global's long-distance network. In return, the defendant agreed to purchase long-distance service from the plaintiff at rates enumerated in the purchase agreement for certain specified geographical areas. Ultimately, Global was to sell long-distance service to the plaintiff at a fixed rate per minute, and the plaintiff was to resell that service to the defendant at a marked up rate. The defendant, in turn, would provide long-distance service to its own customers at a further markup.

The purchase agreement included a minimum usage guarantee, pursuant to which the defendant obtained long-distance services from the plaintiff on a " 'take or pay' " basis. This meant that the defendant was required to pay a minimum amount each month for the plaintiff's services, even if it did not run any calls through the circuit. Any usage exceeding the minimum would be billed to the defendant at an agreed upon rate per minute. This clause of the purchase agreement was to have run through December, 2009.

As we have indicated, the purchase agreement became effective on November 1, 2006. Long-distance service under the purchase agreement commenced on December 1, 2006, and the defendant ran enough long-distance service through the circuit in the month of December, 2006, to meet its minimum usage requirement. During that month, the plaintiff and Global also amended their retail customer agreement. After execution of this amendment, the plaintiff began to run a higher volume of long-distance service through Global.

By mid-January, 2007, a dispute had arisen between Global and the plaintiff about the terms of their amended retail customer agreement and, specifically, about the amount and scope of the long-distance service that the plaintiff was sending through Global's network. See generally *In re CCT Communications, Inc.*, United States Bankruptcy Court, Docket No. 07-10210 (SMB)

(S.D.N.Y. July 2, 2008). Global was of the opinion that the plaintiff was violating the amended retail customer agreement and taking unfair advantage of Global by reselling certain services.[4] Id.

In any event, the result of the plaintiff's routing so many long-distance calls through Global was that the defendant's clients and their customers encountered an increasing number of service problems. Calls would not complete, would continue to ring, or would result in a fast busy signal or dead air. These issues were brought to Global's attention by way of trouble tickets filed by the defendant. The purchase agreement authorized the defendant to open such trouble tickets directly with Global if the defendant had service problems. During January, 2007, the defendant filed a number of trouble tickets with Global because of service problems with calls being routed through the circuit.

In addition to the service problems that arose after the plaintiff attempted to run an increasing number of calls through Global's network, Global grew concerned by January, 2007, because the plaintiff was not current with its payments. By that time, the plaintiff owed Global approximately $2 million and had exceeded its credit limits with Global. These issues were memorialized in a letter from Global to Vlahos on January 11, 2007. At that time, Global put the plaintiff on notice that, if a resolution of these problems was not achieved, Global would terminate all services to the plaintiff on January 25, 2007.

Between January 11, 2007, and January 25, 2007, the plaintiff continued to increase international and domestic long-distance traffic through Global, which resulted in additional service problems. In response, Global began to throttle down the plaintiff's access to its service. By January 17, 2007, Global had blocked international long-distance calling service to the plaintiff. After that date, the plaintiff continued to push through domestic, long-distance calls at what the trial court characterized as "an excessive rate." But see footnote 4 of this opinion. This influx of domestic, long-distance calls caused major service issues for Global. For example, 192,000 calls would not complete on January 19, 2007, and 142,000 calls would not complete on January 20 and 21, 2007.

On January 25, 2007, Egan, who had since become the defendant's chief financial officer, sent a letter to the plaintiff advising it of multiple service issues for long-distance calls being transmitted through the circuit. The defendant requested assistance from the plaintiff to resolve these issues. The defendant stated that if assistance was not forthcoming, the defendant would not be committed by the purchase agreement to pay the minimum usage charge for January, 2007, due to unacceptable service quality.

The following day, on January 26, 2007, Global blocked all calls generated through the plaintiff. Global also sent a letter to the plaintiff on that date terminating their relationship and claiming that the plaintiff was in breach of contract because it was reselling the services in alleged contravention of the amended retail customer agreement. A copy of this termination notice was inadvertently faxed to the defendant's switch room by Global, making the defendant aware of the seriousness of the dispute between Global and the plaintiff.

As a result of the termination of service by Global, which shut down all of the Global circuits operated by the plaintiff, on January 29, 2007, the plaintiff filed its bankruptcy petition in the United States Bankruptcy Court for the Southern District of New York. Because of the automatic stay provisions that come into effect upon filing of a bankruptcy petition; see 11 U.S.C. § 362 (a) (3) (2012); Global concluded that it was compelled to reconnect the circuits.

Although service was restored to the Global circuit by January 31, 2007, on February 5, 2007, the defendant notified the plaintiff by letter that it was exercising its right to terminate their contractual relationship. The defendant purported to terminate pursuant to § 7 (b) of the purchase agreement, which provides, among other things, that either party may terminate upon thirty days written notice if the other party files a voluntary bankruptcy petition.[5]

Between February 5, 2007, and March 24, 2007, Vlahos and Egan exchanged a series of letters about their positions vis-à-vis the bankruptcy and the continuation of the purchase agreement. The plaintiff's position was that the bankruptcy proceedings stayed the shut off of service by Global and, therefore, that the defendant remained obligated to use the circuit or to pay the minimum monthly usage charge. The defendant's position was that it had notified the plaintiff of service problems prior to the shut off of service by Global and that the shut off jeopardized service to the defendant's clients. Because of the instability of the relationship between the plaintiff and Global, the defendant took the position that it could not continue to use the circuit unless it was given adequate assurance from Global that it could rely on the service being operational and not subject to further shutdown. The plaintiff insisted that it was not obligated by law to provide any such adequate assurance and declined to do so.

Meanwhile, on March 15, 2007, the circuit went into alarm, which precipitated an inquiry from Global. Upon confirmation by the defendant that it was not running any traffic through the circuit, Global removed the circuit from service. This meant that the circuit was not operational and could no longer provide long-distance service. The circuit was never restored to working

order. The trial court found that to do so would have required a request to Global by the plaintiff,[6] which Global never received. Consequently, as of March 15, 2007, the circuit that would have run the defendant's long-distance calls under the purchase agreement was inoperable.

Although the parties continued to correspond sporadically between March 24, 2007, and November 25, 2009, the dispute between the plaintiff and the defendant primarily played out in the proceedings before the United States Bankruptcy Court for the Southern District of New York. Specifically, on January 27, 2009, the plaintiff commenced an adversary proceeding against the defendant, alleging breach of the purchase agreement. See *In re CCT Communications, Inc.*, 420 B.R. 160, 177–78 (Bankr. S.D.N.Y. 2009).

The bankruptcy petition was dismissed on November 25, 2009. Id., 178. The Bankruptcy Court dismissed the petition because the plaintiff, having filed a plan of reorganization on November 26, 2007, failed to timely confirm the plan as required by 11 U.S.C. § 1129. Id., 166, 168, 178. The court retained jurisdiction over the ongoing dispute between the plaintiff and Global, but declined to retain jurisdiction over the adversary proceeding between the plaintiff and the defendant, noting that the latter dispute had not advanced beyond the pleading stage and primarily involved questions of state contract law.[7] Id., 178.

The plaintiff then filed the present action in December, 2009, upon the dismissal of the bankruptcy petition. In its two count complaint, the plaintiff claimed (1) breach of contract for the defendant's failure to pay the monthly amounts owed under the purchase agreement, and (2) account stated. In response, the defendant filed an answer and counterclaim. In its three count counterclaim, the defendant (1) alleged breach of contract for the plaintiff's failure to provide services under the purchase agreement, (2) sought a declaratory judgment that the defendant's obligations to the plaintiff were terminated no later than thirty days after the defendant's letter to the plaintiff dated February 5, 2007, and (3) sought a judgment declaring that, among other things, the plaintiff had no right to continue its utilization of the defendant's switch room.

The case was tried to the trial court, *Agati, J.*, which rendered judgment for the defendant on the plaintiff's complaint and on count one of the defendant's counterclaim in the amount of $694,000. In addition, the trial court awarded statutory costs in the amount of $655 and attorney's fees in the amount of $936,441.18. The trial court also rendered declaratory judgment as requested in count two of the defendant's counterclaim.

On appeal,[8] the parties disagreed as to the basis for the trial court's conclusion that the plaintiff, rather than

the defendant, had breached the purchase agreement. The plaintiff took the position that the trial court had determined, as a matter of law, that (1) the plaintiff breached the purchase agreement by filing for bankruptcy, (2) under the circumstances of the present case, federal bankruptcy law does not invalidate § 7 (b) of the purchase agreement, which allows a party to terminate the contract when the other party files a bankruptcy petition and, therefore, (3) the defendant's letter of February 5, 2007, was a valid and effective termination of the purchase agreement and did not constitute a breach of contract by the defendant. The plaintiff took issue with all three of these conclusions. In the alternative, the plaintiff argued that, even if the trial court had correctly construed and applied federal bankruptcy law, the trial court had incorrectly (1) failed to hold the defendant liable for financial obligations it incurred both before and after the defendant's purported termination, and (2) awarded damages in excess of the limitation of liability clause of the purchase agreement.

For its part, the defendant argued that, although the trial court correctly construed federal bankruptcy law, this court need not resolve the bankruptcy questions because the trial court also found, largely as a matter of fact, that the plaintiff had breached the purchase agreement by providing inadequate service. The defendant urged us to decide the appeal on the basis of that alternative ground for affirmance.

Following oral argument, this court, sua sponte, ordered the trial court to issue an articulation pursuant to Practice Book § 60-5. After receiving the trial court's articulation, we affirmed the judgment of the trial court on the basis of the defendant's alternative ground for affirmance. See *CCT Communications, Inc.* v. *Zone Telecom, Inc.*, 324 Conn. 654, 658 and n.2, 153 A.3d 1249 (2017). Subsequently, we granted the plaintiff's timely motion for reconsideration en banc.[9] Additional facts and procedural history will be set forth as necessary.

I

Because we initially decided this case on the basis of the defendant's alternative ground for affirmance; see id., 658 n.2; we first address the plaintiff's argument in its motion for reconsideration en banc that the record is not sufficient to permit us to affirm the judgment of the trial court on that ground. On further review of the trial record, we now are persuaded that the plaintiff is correct in this regard and that the trial court did not find that the plaintiff breached the purchase agreement by providing inadequate service.

A

The following additional procedural history is relevant to our consideration of this issue. Count one of the defendant's counterclaim, which stated a breach of

contract claim, alleged that the plaintiff, "by failing to provide the service it contracted to provide to [the defendant through the] circuit, breached its obligations . . . under the terms of the [purchase] [a]greement." Nowhere in the counterclaim did the defendant allege that the plaintiff had breached the purchase agreement by filing for bankruptcy protection. Rather, the defendant raised the issue of the bankruptcy petition as a defense to the plaintiff's breach of contract claim and with respect to count two of the counterclaim, which sought a declaratory judgment that the defendant's own obligations under the purchase agreement had terminated no later than thirty days after the defendant exercised its right to terminate under § 7 (b).

In its memorandum of decision, however, the trial court appeared to misunderstand the nature of the defendant's breach of contract counterclaim, construing it as alleging that the plaintiff had breached the purchase agreement by filing for bankruptcy protection. In summarizing the action, the trial court characterized the counterclaim as follows: "[The defendant] counterclaimed . . . alleging that [the plaintiff] breached the [purchase] agreement by, inter alia, filing a voluntary bankruptcy petition on January 29, 2007. [The defendant] also seeks a declaratory judgment concerning the rights of the parties under the [purchase] agreement." Later in the decision, in its legal analysis of the competing breach of contract claims, the trial court never directly addressed the defendant's allegations that the plaintiff breached the purchase agreement by failing to provide the services that it had contracted to provide. Rather, the court began its analysis by stating that, "[a]lthough this is a breach of contract action, the key legal issue before the court is the impact of [the plaintiff's] voluntary bankruptcy petition." The court then spent seventeen pages parsing the bankruptcy code, ultimately concluding that the relevant provisions did not preclude the defendant from exercising its contractual right to terminate the purchase agreement.

Immediately following its analysis of the bankruptcy issues, the court concluded as follows: "The court finds that [the defendant] has presented ample evidence to establish each of the elements in support of its claim that [the plaintiff] breached its obligations under the purchase agreement of November 1, 2006. The breach took place when [the plaintiff] filed its voluntary bankruptcy petition of January 29, 2007. Pursuant to [§] 7 (b), [the defendant] exercised its right to terminate the purchase agreement on February 5, 2007. The court finds for [the defendant] on count [one] of its counterclaim for breach of contract." In other words, the trial court appeared to treat the bankruptcy questions as dispositive not only of the defendant's defense to the plaintiff's breach of contract claim—the defendant had argued that the plaintiff's bankruptcy excused it from further performance—but also of the defendant's own

breach of contract counterclaim.

On appeal, the plaintiff interpreted the memorandum of decision to mean that the trial court resolved the competing breach of contract claims solely on the basis of the bankruptcy arguments and, accordingly, the plaintiff focused its appellate argument on those questions. The defendant, by contrast, was of the view that the trial court also made an independent finding that the plaintiff breached the purchase agreement by failing to provide adequate service. In support of this alternative ground for affirmance, the defendant directed our attention to three aspects of the record.

First, the defendant noted that the trial court made a number of factual findings indicating that the defendant encountered serious service problems in January, 2007, culminating in the total cessation of service for several days, and implied that the plaintiff was responsible for those service problems. The trial court also expressly found that the defendant's principal witness testified credibly whereas the plaintiff's did not. The defendant emphasized that the trial court prefaced its factual findings and credibility determinations by stating that it was setting forth "the salient facts [that the court] finds relevant and pertinent to the final decision in this case." The defendant argued that there would have been no reason for the court to make such extensive factual findings, and that such findings would not have been legally relevant, had the court in fact found that the plaintiff's bankruptcy was the sole ground on which it breached the purchase agreement.[10]

Second, the defendant noted that the trial court found that the defendant "presented ample evidence to establish each of the elements in support of its claim that [the plaintiff] breached its obligations under the purchase agreement of November 1, 2006." Because the counterclaim actually alleged a failure to provide service, the defendant argued, the trial court's finding that all of the elements of that claim were satisfied necessarily implied that the court found a breach of contract on that basis.[11]

Third, the defendant argued that the trial court's judgment and the judgment file resolve any ambiguity as to whether the court found a breach of contract for failure to provide service. The defendant emphasized that the court rendered judgment on the counterclaim in its favor with respect to both count one, which alleged breach of contract, and count two, which sought a declaratory judgment, but had referenced the bankruptcy petition only in relation to the latter. From this fact, the defendant deduced that the court must have decided count one in its favor on a different basis, namely, the plaintiff's alleged failure to provide adequate service.[12]

The defendant found further support for this theory in

the judgment file, wherein the trial court characterized count one of the counterclaim as alleging "claims of breach of contract based on [the plaintiff's] alleged failure to provide the contracted service . . . ." The defendant posited that the fact that the court rendered judgment for the defendant on count one, after having accurately characterized the nature of that count, means that the court must have found that the plaintiff breached the purchase agreement by failing to provide adequate service.[13]

To resolve these ambiguities, following oral argument, this court, sua sponte, ordered the trial court to issue an articulation addressing the following two questions: (1) "In addition to finding in favor of [the defendant] on its declaratory judgment claim in count [two] of its counterclaim, did the trial court find that [the plaintiff] had breached [the purchase agreement by failing] to provide telecommunication services as alleged in count [one] of [the defendant's] counterclaim when it stated [that] '[t]he court finds that [the defendant] has presented ample evidence to establish each of the elements in support of its claim that [the plaintiff] breached its obligations under the purchase agreement . . . ?' " (2) "If the answer to question one is in the affirmative, then were the damages awarded by the trial court based upon the breach of contract as found by the court in count [one] of [the defendant's] counterclaim?"

In its subsequent articulation, the trial court responded to this court's first question as follows: "The response is in the affirmative that this court did find that [the defendant] had proven that [the plaintiff] had breached the purchase agreement . . . . [T]his court noted [in] its original decision [that] [t]he breach took place when [the plaintiff] filed its voluntary bankruptcy petition of January 29, 2007. Pursuant to [§] 7 (b) [of the purchase agreement], [the defendant] exercised its right to terminate the purchase agreement on February 5, 2007. The court finds for [the defendant] on count [one] of its counterclaim for breach of contract."

In its articulation, the trial court responded to this court's second question as follows: "[T]his court's award of damages to the defendant was based upon the finding of the breach of contract by the plaintiff as alleged in count [one] of [the defendant's] counterclaim.

"This court heard evidence on damages both from [the] plaintiff as to its claims for breach of contract and the defendant as to its claims for breach of contract. This court found the supporting evidence favored the defendant's claim for breach of contract.

"Although the defendant presented evidence of damages far in excess of what this court ordered . . . [this] court found the liquidated damages clause [set forth in § 4 (c) of the purchase agreement] limited the extent of the damages that could be awarded to the defendant

for the plaintiff's breach of contract. [This] court's award of damages to the defendant was based on the finding of the breach of the purchase agreement as alleged in count [one] of [the defendant's] counterclaim."

B

Unfortunately, the trial court's articulation did little to clarify the basis for its decision or to dispel the ambiguities identified by the parties. On the one hand, the court answered our first question "in the affirmative," implying that it did find that the plaintiff had breached the purchase agreement by failing to provide telecommunication services as required under the purchase agreement. On the other hand, the court took the opportunity to reiterate that the breach occurred when the plaintiff filed its bankruptcy petition. Notably, in rephrasing the articulation order, the trial court omitted our reference to a "failure to provide telecommunication services," instead framing the question as: "The first issue requiring articulation is whether this court found that [the plaintiff] had breached its contract with [the defendant] as alleged in count [one] of [the] counterclaim." In fact, the word "service" does not appear anywhere in the court's articulation.

Although one can read the tea leaves in different ways, the fact that the trial court repeatedly has stated that it found breach of contract on the basis of bankruptcy, but studiously has avoided making any clear, express statement that it also found a breach for failure to provide service, strongly favors the plaintiff's interpretation of the decision. See Practice Book § 64-1 (a) (requiring that "court's decision shall encompass its conclusion as to each claim of law raised by the parties and the factual basis therefor"). In any event, having canvassed the full trial record and reviewed the parties' arguments on reconsideration, we now are persuaded that the court's memorandum of decision, without additional findings, is simply insufficient to support a conclusion that the plaintiff breached the purchase agreement by failing to provide adequate service.

We begin with the applicable legal principles and standard of review. "The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." *Meyers* v. *Livingston, Adler, Pulda, Meiklejohn & Kelly, P.C.*, 311 Conn. 282, 291, 87 A.3d 534 (2014). The interpretation of definitive contract language is a question of law over which our review is plenary. See *Joseph General Contracting, Inc.* v. *Couto*, 317 Conn. 565, 575, 119 A.3d 570 (2015). By contrast, the trial court's factual findings as to whether and by whom a contract has been breached are subject to the clearly erroneous standard of review and, if supported by evidence in the record, are not to be disturbed on appeal. See Practice Book § 60-5; see also *Connecti-*

*cut National Bank* v. *Giacomi*, 242 Conn. 17, 70, 699 A.2d 101 (1997).

In the present case, the trial court's findings of fact arguably would support the conclusions that (1) the plaintiff was at fault for serious service problems that occurred beginning January, 2007, and for Global's ultimate decision to shut down the circuit for several days at the end of that month; but see footnote 4 of this opinion; and (2) the plaintiff was obliged to ask Global to reactivate the circuit after Global shut it off following the March 15, 2007 alarm, but failed to do so. Neither the trial court nor the defendant, however, has explained exactly how those findings and conclusions, even if true, support the ultimate legal conclusion that the plaintiff materially breached the purchase agreement. As the plaintiff emphasizes in its motion for reconsideration en banc, various provisions of the purchase agreement envisioned that there would be periodic service problems that the parties would have to resolve. For example, the purchase agreement directs the defendant to submit trouble tickets when service problems arise. Likewise, § 6 of the purchase agreement provides that, if one party believes that the other has defaulted on any of its obligations, the aggrieved party must provide written notice thereof, upon which the party in default shall have thirty days to cure the default. In order to find a material breach of contract, then, the trial court needed to find, among other things, that the service problems were more significant or persistent than those that the parties envisioned would arise in the ordinary course of business, and also that the defendant satisfied its obligations under § 6 to afford the plaintiff an opportunity to cure those problems. There is no indication in the record that the court so found.

The earliest date that the trial court specifically found service problems caused by the plaintiff that were adversely impacting the defendant was January 11, 2007. After that, international long-distance calling was curtailed on January 17, 2007, "major service issues" arose between January 19 and 21, 2007, which the defendant brought to the plaintiff's attention on January 25, 2007, and the circuit was completely shut down for several days beginning January 26, 2007, after which the initiation of bankruptcy proceedings compelled Global to restore full service.

The following week, on February 5, 2007, the defendant notified the plaintiff by letter that it was exercising its right to terminate the purchase agreement pursuant to § 7 (b). This was approximately one week after long-distance service was shut off and then restored, eleven days after the defendant wrote the plaintiff to complain about serious service problems, nineteen days after international calling was curtailed, and twenty-five days after the first specific date on which the trial court found that service problems had occurred. There is no

indication in the memorandum of decision that, prior to terminating the purchase agreement, the defendant ever provided the plaintiff with thirty days' notice and an opportunity to cure the service problems. In the absence of a determination by the trial court that § 6 of the purchase agreement was satisfied or that its requirements did not apply, it is difficult to understand how the facts as found by the trial court could support a conclusion that the plaintiff materially breached the contract prior to receiving the February 5, 2017 letter. See *Weiss* v. *Smulders*, 313 Conn. 227, 264, 96 A.3d 1175 (2014) (holding, with respect to similar contractual provision, that failure to provide notice and thirty days to cure precluded nonbreaching party from terminating agreement).

Nor do we understand how Global's failure to restore service to the circuit after it went into alarm on March 15, 2007, could have constituted a material breach of the purchase agreement by the plaintiff. Even if we assume, for the sake of argument, that the plaintiff was obliged but refused to contact Global to restore service at that point; see footnote 6 of this opinion; the defendant already had announced its intention to terminate the purchase agreement on February 5, 2017. The defendant offers no explanation as to why that termination would not have released the plaintiff from any further contractual obligations.[14]

Moreover, we note that the trial court found the testimony of Egan, the defendant's chief financial officer, to be credible. But Egan himself appeared to undercut the defendant's failure of service counterclaim at trial, testifying as follows: "We terminated the [purchase] agreement. The service interruptions in and of themselves were not the basis upon which we said we couldn't go forward. Absent . . . the complications between Global [and the plaintiff] and their contract and absent the bankruptcy, our expectation would have been that the technical issues in the normal course would have been resolved. How long it would have taken, I don't know, but probably not that long. These were not insurmountable, and we would have . . . resumed routing the traffic that was the expectation." It is difficult to reconcile a conclusion that the trial court found a breach of contract for failure to provide service with the fact that the only witness whose testimony the court expressly credited appeared to rule out the possibility that the service interruptions that took place in January, 2007, were serious enough to constitute, or were viewed by the defendant as, a material breach of the purchase agreement.[15]

For all of these reasons, we now conclude that we must decline the defendant's invitation to affirm the judgment of the trial court on the alternative ground that the court found that the plaintiff breached the purchase agreement by failing to provide adequate ser-

vice prior to receipt of the defendant's termination letter. Accordingly, we must proceed to consider whether the trial court properly determined that, by filing a voluntary bankruptcy petition, the plaintiff either (1) materially breached the purchase agreement or (2) excused the defendant from performing its contractual obligations.

## II

We next turn our attention to the theory on which the trial court undisputedly did decide the present case, namely, that the plaintiff's bankruptcy petition constituted a breach of the purchase agreement that justified the defendant's termination. The plaintiff challenges both conclusions, arguing that (1) nothing in the contractual language indicates that a party's bankruptcy constitutes a breach of the purchase agreement, and (2) the bankruptcy code bars the enforcement of contractual provisions, such as § 7 (b) of the purchase agreement, that allow one party to terminate a contract in response to another party's bankruptcy. The proper interpretation of both contractual and statutory language presents questions of law over which our review is plenary. *Southeastern Connecticut Regional Resources Recovery Authority* v. *Dept. of Public Utility Control*, 244 Conn. 280, 290, 709 A.2d 549 (1998).

### A

We first consider the plaintiff's argument that the trial court improperly concluded that it breached the purchase agreement by filing for bankruptcy protection. Regardless of whether § 7 (b) of the purchase agreement was enforceable under federal law; see part II B of this opinion; the plaintiff contends that nothing in that section, or elsewhere in the purchase agreement, specified that a party's bankruptcy petition would be deemed a material breach of the contract.[16] We agree.

Section 7 (b) of the purchase agreement, on which the trial court relied, provides: "During this term, this [a]greement may be terminated by either party upon thirty . . . days written notice of such termination to the other party in the event that the [nonterminating] party hereto has made a general assignment for the benefit of creditors, has filed a voluntary or has had filed against it an involuntary petition in bankruptcy, or has had a receiver or trustee appointed for substantially all of its assets; provided, however, that at the time of such termination notice the terminating party is not then in default of any of the terms of this [a]greement." Nothing in the plain language of this provision suggests that a bankruptcy filing will constitute a material breach of the purchase agreement, only that a bankruptcy affords the other party the option to terminate if it desires. It is well established that a contract may allow for termination under conditions that do not constitute a material breach. See, e.g., 3 Restatement

(Second), Contracts § 368 (1981). Nor does any other provision of the purchase agreement state that the filing of a bankruptcy petition constitutes a material breach. Accordingly, the plain language of the purchase agreement itself does not support the trial court's conclusion that filing the petition constituted a breach by the plaintiff.

We further observe that, although some early cases held that bankruptcy constituted a breach of the executory contracts of the bankrupt; see *Central Trust Co.* v. *Chicago Auditorium Assn.*, 240 U.S. 581, 592, 36 S. Ct. 412, 60 L. Ed. 811 (1916); the common law no longer permits a party to a contract to treat another party's declaration of bankruptcy, without more, as a material breach. Rather, the modern rule is that bankruptcy does not constitute a per se breach of contract and does not excuse performance by the other party in the absence of some further indication that the party filing for bankruptcy either cannot, or does not, intend to perform. See *Central States, Southeast & Southwest Areas Pension Fund* v. *Basic American Industries, Inc.*, 252 F.3d 911, 917 (7th Cir. 2001) ("Merely filing for the protection of the bankruptcy court is not a repudiation of obligations or a cessation of operations. . . . An insolvent firm is not necessarily out of business, and the parties with which it has contracts cannot automatically assume that the firm will default . . . ." [Citations omitted.]), cert. denied, 534 U.S. 1079, 122 S. Ct. 808, 151 L. Ed. 2d 694 (2002); see also 2 E. Farnsworth, Contracts (3d Ed. 2004) § 8.21, p. 564 n.20; 15 R. Lord, Williston on Contracts (4th Ed. 2000) § 43.29; 2 Restatement (Second), Contracts § 252, comment (a) (1981). In the pres -ent case, the trial court did not find that the plaintiff either could not or did not intend to perform its obligations as a result of its bankruptcy filing. We therefore conclude that the trial court incorrectly determined that the plaintiff breached the purchase agreement by filing for bankruptcy protection.

B

We next turn our attention to the question of whether the trial court properly determined that § 7 (b) of the purchase agreement was enforceable and, therefore, that the defendant was within its rights to terminate the purchase agreement upon the plaintiff's initiation of bankruptcy proceedings. As discussed in part II A of this opinion, § 7 (b) provides that either party has the right to terminate the purchase agreement if the other party files a voluntary bankruptcy petition. Contractual provisions of this sort are frequently referred to as ipso facto clauses. See *In re Dumont*, 581 F.3d 1104, 1107 (9th Cir. 2009). As a general rule, the bankruptcy code bars the enforcement of ipso facto clauses, providing that an executory contract of a debtor may not be terminated solely as a result thereof. See 11 U.S.C. § 365 (e) (2012).[17] Although there are a number

of possible exceptions to this rule, only two are at issue in the present appeal.

First, the trial court found that § 7 (b) of the purchase agreement was enforceable and, therefore, that the defendant had validly exercised its right to terminate the purchase agreement, because the so-called "ride-through" doctrine provided an exception to 11 U.S.C. § 365 (e). On appeal, the plaintiff contends that the trial court misconstrued federal bankruptcy law and that the defendant's termination of the purchase agreement was not sanctioned by the ride-through doctrine.

Second, the trial court rejected the defendant's alternative theory that § 7 (b) of the purchase agreement was enforceable because it constituted a commodity forward contract and, therefore, was exempt from 11 U.S.C. § 365 (e). As an alternative ground for affirmance, the defendant challenges that determination on appeal.

Because these questions require that we interpret a federal statute, we begin by setting forth the rules and principles that govern our interpretation of federal law. "With respect to the construction and application of federal statutes, principles of comity and consistency require us to follow the plain meaning rule . . . . Moreover, it is well settled that the decisions of [t]he [United States Court of Appeals for the] Second Circuit . . . carry particularly persuasive weight in the interpretation of federal statutes by Connecticut state courts." (Citation omitted; footnote omitted; internal quotation marks omitted.) *Szewczyk* v. *Dept. of Social Services*, 275 Conn. 464, 474–75, 881 A.2d 259 (2005).

1

We first consider the plaintiff's claim that the trial court improperly concluded that § 7 (b) of the purchase agreement was enforceable, despite the fact that the bankruptcy code generally bars the enforcement of ipso facto provisions, because the ride-through doctrine provides an exception to 11 U.S.C. § 365 (e). We begin by describing the relevant statutory framework.

Prior to the adoption of the bankruptcy code, federal law permitted the enforcement of contractual clauses that modify the relationships of contracting parties due to the filing of a bankruptcy petition. See, e.g., *Summit Investment & Development Corp.* v. *Leroux*, 69 F.3d 608, 610 (1st Cir. 1995); *Days Inn of America, Inc.* v. *161 Hotel Group, Inc.*, 55 Conn. App. 118, 124–25, 739 A.2d 280 (1999). When Congress enacted the bankruptcy code in 1978, however, it changed this long-standing rule. Specifically, 11 U.S.C. § 365 (e) (1) provides: "Notwithstanding a provision in an executory contract or unexpired lease, or in applicable law, an executory contract or unexpired lease of the debtor may not be terminated or modified, and any right or obligation under such contract or lease may not be terminated or modified, at any time after the com-

mencement of the case solely because of a provision in such contract or lease that is conditioned on . . . (A) the insolvency or financial condition of the debtor at any time before the closing of the case; (B) the commencement of a case under this title; or (C) the appointment of or taking possession by a trustee in a case under this title or a custodian before such commencement." The principal rationale behind this prohibition on the exercise of ipso facto clauses is that allowing the debtor to retain advantageous contracts enhances the likelihood of successful reorganization while also increasing the assets available to creditors should the bankruptcy estate ultimately enter liquidation. See *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1355 (9th Cir. 1983); *Days Inn of America, Inc.* v. *161 Hotel Group, Inc.*, supra, 125; see also *Summit Investment & Development Corp.* v. *Leroux*, supra, 610 ("automatic termination of a debtor's contractual rights frequently hampers rehabilitation efforts by depriving the chapter 11 estate of valuable property interests at the very time the debtor and the estate need them most" [internal quotation marks omitted]).

As the trial court recognized, however, 11 U.S.C. § 365 (e) must be read in conjunction with the other provisions of that statute. Of particular relevance for present purposes are subsections (a) and (d), which set forth the rules governing the assumption or rejection of an executory contract by the bankruptcy trustee.[18] Title 11 of the United States Code, § 365 (a) provides in relevant part that "the trustee, subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." Section 365 (d) further provides in relevant part: "(1) In a case under chapter 7 of this title, if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within [sixty] days after the order for relief . . . then such contract or lease is deemed rejected. (2) In a case under chapter 9, 11, 12, or 13 of this title, the trustee may assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor at any time before the confirmation of a plan but the court, on the request of any party to such contract or lease, may order the trustee to determine within a specified period of time whether to assume or reject such contract or lease."

Courts and commentators have recognized two important implications of these provisions. First, assumption or rejection of an executory contract is discretionary; the trustee *may* accept or reject an executory contract of the debtor, but need not do either. See 3 A. Resnick & H. Sommer, Collier on Bankruptcy (16th Ed. 2009) § 365.03 [6], p. 365-33. Second, whereas executory contracts that are not expressly assumed or rejected within sixty days are deemed rejected in a chapter 7 bankruptcy, that default rule does not apply

to chapter 11 proceedings. Rather, the bankruptcy code allows a chapter 11 trustee to assume or reject an executory contract at any time prior to the confirmation of a reorganization plan, unless the bankruptcy court requires that a decision be made prior to that time. "[T]his difference between the two types of proceedings reflects the considered judgment of Congress that a [debtor in possession] seeking to reorganize should be granted more latitude in deciding whether to reject a contract than should a trustee in liquidation." *National Labor Relations Board* v. *Bildisco & Bildisco*, 465 U.S. 513, 529, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984).

Notably, the bankruptcy code does not specify the legal status of an executory contract that is *never* expressly assumed or rejected during a chapter 11 proceeding. To address this statutory lacuna, courts generally have applied a rule predating adoption of the bankruptcy code, namely, the ride-through doctrine. See generally M. Campbell & R. Hastie, "Executory Contracts: Ride-Through Revisited," 19 Amer. Bankr. Inst. J. 33 (2000). Generally stated, the ride-through doctrine provides that executory contracts that are neither affirmatively assumed nor rejected in the context of a chapter 11 proceeding pass through the reorganization unaffected and become obligations of the reorganized debtor. See *In re Nevada Emergency Services, Inc.*, 39 B.R. 859, 861 n.1 (Bankr. D. Nev. 1984). The legal status of ride-through contracts, thus, differs not only from contracts that are formally rejected by the trustee, which are treated as breached, giving the nondebtor party a right to claim as an unsecured creditor against the bankruptcy estate; see 11 U.S.C. § 365 (g) (2012); *In re National Gypsum Co.*, 208 F.3d 498, 505 (5th Cir.), cert. denied, 531 U.S. 871, 121 S. Ct. 172, 148 L. Ed. 2d 117 (2000); but also from contracts that are formally assumed, which the debtor is permitted to assign but for which the debtor must cure any defaults and provide adequate assurance of future performance. See 11 U.S.C. § 365 (b) (1) and (f) (1) (2012); *In re JZ L.L.C.*, 371 B.R. 412, 422 (B.A.P. 9th Cir. 2007). The question before us is whether the trial court properly concluded that ride-through doctrine (1) is applicable to the present case, and (2) applies so as to circumvent the protections embodied in 11 U.S.C. § 365 (e).

The following additional undisputed facts and procedural history are relevant to this question. When the plaintiff filed its bankruptcy petition on January 29, 2007, the purchase agreement was executory for purposes of the bankruptcy code—material duties were yet to be performed by both parties. See *In re Boates*, 551 B.R. 428, 434 (B.A.P. 9th Cir. 2016). The bankruptcy petition was dismissed on November 25, 2009, without the plaintiff ever having confirmed a plan of reorganization. During the nearly three years that passed between the filing of the bankruptcy petition and its dismissal, the plaintiff neither assumed nor rejected the purchase

agreement. During that time, the defendant also never requested that the bankruptcy court order the plaintiff to make such a selection, as was its right under 11 U.S.C. § 365 (d) (2). See *In re CCT Communications, Inc.*, supra, 420 B.R. 178.

In its memorandum of decision, the trial court recognized that the ride-through doctrine is a judicially created rule that predated adoption of the bankruptcy code. See *Consolidated Gas Electric Light & Power Co.* v. *United Railways & Electric Co.*, 85 F.2d 799, 805 (4th Cir. 1936), cert. denied, 300 U.S. 663, 57 S. Ct. 493, 81 L. Ed. 871 (1937). The trial court further noted that, although the ride-through doctrine has not been codified, it continues to be widely applied by the federal courts, including the Second Circuit.[19] See *In re Boston Post Road Ltd. Partnership*, 21 F.3d 477, 484 (2d Cir. 1994), cert. denied, 513 U.S. 1109, 115 S. Ct. 897, 130 L. Ed. 2d 782 (1995). The trial court concluded that (1) the doctrine applies to the present case, insofar as the plaintiff never expressly assumed or rejected the purchase agreement prior to the dismissal of its bankruptcy petition, and (2) the fact that the purchase agreement was "unaffected" by the bankruptcy meant that the defendant's purported termination pursuant to § 7 (b) of the purchase agreement became valid upon dismissal of the petition. On appeal, the plaintiff challenges both conclusions.[20]

a

We first consider the plaintiff's argument that the ride-through doctrine, as typically articulated, does not apply to the present case. The ride-through doctrine generally has been applied when a plan of reorganization is confirmed without specifying whether a particular executory contract is assumed or rejected. See *In re Dehon, Inc.*, 352 B.R. 546, 560 (Bankr. D. Mass. 2006) (doctrine has "arisen largely in cases where, through presumed oversight, the debtor neglected to appropriately assume or reject a contract prior to confirmation of the [c]hapter 11 plan"). Under those circumstances, in which the legal status of the contract with respect to the reorganized entity is uncertain, the doctrine provides that contracts neither assumed nor rejected ride through to the *reorganized* entity. See *Consolidated Gas Electric Light & Power Co.* v. *United Railways & Electric Co.*, supra, 85 F.2d 805; *In re Polysat, Inc.*, 152 B.R. 886, 890 (Bankr. E.D. Pa.1993). We are not aware of, and the defendant has failed to identify, any cases in which a court has applied the doctrine when a bankruptcy petition is dismissed prior to the confirmation of a reorganization plan.[21] Under those circumstances, at least one federal court has suggested that, because "there is no reorganized debtor, there is no [new] entity for the contract to ride-through to." (Emphasis omitted.) *In re Dehon, Inc.*, supra, 565 n.20. Rather, 11 U.S.C. § 349 (b) (3) automatically revests the property of the

estate, including contract rights, in the debtor upon dismissal. Accordingly, we agree that the ride-through doctrine does not apply in the context of the present case.

b

Even if the ride-through doctrine did apply, however, we do not agree with the trial court's conclusion that the doctrine created an exception to the prohibition against ipso facto clauses contained in 11 U.S.C. § 365 (e) and, thus, validated the defendant's purported termination of the purchase agreement.[22] Although the trial court did not expressly connect the dots, it appears to have relied on two distinct theories in concluding that § 7 (b) of the purchase agreement was enforceable under the circumstances of the present case, notwithstanding 11 U.S.C. § 365 (e). We consider each theory in turn.

First, the trial court relied on *In re Hernandez*, 287 B.R. 795 (Bankr. D. Ariz. 2002), for the proposition that a chapter 11 debtor may not avail itself of any of the protections of 11 U.S.C. § 365, including those relating to ipso facto clauses, until it formally assumes an executory contract. According to *Hernandez*, "ride-through is not a de facto assumption [that contracts not expressly rejected are deemed to be assumed]. . . . A contract that is not assumed is not entitled to the benefits afforded by 11 U.S.C. § 365 *such as insulation from ipso facto provisions* . . . . Unless and until an executory contract is assumed, the debtor is not afforded any of the rights granted under [11 U.S.C.] § 365 (e). The ride-through theory allows the debtor to retain the benefits as well as the burdens of the contract, not the benefits of assumption." (Emphasis altered.) Id., 800–801. Although this statement was dictum in *Hernandez*, at least with respect to ipso facto clauses, the theory appears to be that a nondebtor party to an executory contract remains free to exercise its right to terminate under an ipso facto clause at any time until the debtor invokes the protection of 11 U.S.C. § 365 (e) by formally assuming the contract.

We decline the defendant's invitation to adopt this more extreme version of the ride-through doctrine. Nothing in the plain language of the bankruptcy code indicates that the protections afforded by 11 U.S.C. § 365 (e) (1) are available to the debtor only upon the assumption of an executory contract. By contrast, various other subsections of 11 U.S.C. § 365 expressly refer to the rights, duties, and implications that flow from assuming or rejecting a contract. See, e.g., 11 U.S.C. § 365 (b) (2012) (assumption requires cure or adequate assurance); 11 U.S.C. § 365 (g) (2012) (rejection constitutes breach); 11 U.S.C. § 365 (i) (2012) (rejection of contract for sale of real property). It is well established that "Congress' use of explicit language in one provision cautions against inferring the same limitation in another

provision." (Internal quotation marks omitted.) *State Farm Fire & Casualty Co.* v. *Rigsby*,     U.S.    , 137 S. Ct. 436, 442, 196 L. Ed. 2d 340 (2016). Moreover, 11 U.S.C. § 365 (e) (2) lists various conditions under which 11 U.S.C. § 365 (e) (1) does not apply, but makes no mention of the need to assume the contract. When "Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent." (Internal quotation marks omitted.) *Hillman* v. *Maretta*,     U.S.    , 133 S. Ct. 1943, 1953, 186 L. Ed. 2d 43 (2013). Both of these canons of statutory construction, thus, counsel against adopting the interpretation of the relevant statutory language set forth in *Hernandez*.

Further, the court in *Hernandez* was seeking to craft an equitable solution to what it twice characterized as "unusual" factual circumstances; *In re Hernandez*, supra, 287 B.R. 798–99; and its interpretation of 11 U.S.C. § 365 (e) does not represent the majority rule. *Hernandez* did not cite to any authority for the proposition that a chapter 11 debtor may not avail itself of the protections afforded by 11 U.S.C. § 365 (e) until it formally assumes an executory contract. Although at least one other bankruptcy court has since followed *Hernandez*; see *In re Taylor Investment Partners II, LLC*, 533 B.R. 837, 843 (Bankr. N.D. Ga. 2015);[23] most courts have, at least implicitly, rejected that rule, affording protection from ipso facto clauses even when the trustee or debtor in possession has not yet assumed the contract at issue. See, e.g., *In re Public Service Co.*, 884 F.2d 11, 15 (1st Cir. 1989); see also *Summit Investment & Development Corp.* v. *Leroux*, supra, 69 F.3d 610; *Milford Power Co., LLC* v. *PDC Milford Power, LLC*, 866 A.2d 738, 758 (Del. Ch. 2004). Although the Second Circuit has not spoken to this question, we find it noteworthy that the court in which the plaintiff's bankruptcy petition was adjudicated has construed 11 U.S.C. § 365 (e) broadly to protect the interests of debtors, explaining that "[i]t is now axiomatic that ipso facto clauses are, as a general matter, unenforceable." *In re Lehman Bros. Holdings, Inc.*, 422 B.R. 407, 415 (Bankr. S.D.N.Y. 2010).

We are persuaded that the rule articulated in *Hernandez* is both impracticable and at odds with the principles that animate the bankruptcy code. Unlike with a chapter 7 bankruptcy, in which the bankruptcy code deems any executory contract not assumed within sixty days to have been rejected, the bankruptcy code permits a chapter 11 debtor in possession to wait to formally declare its intentions up to the time that the plan of reorganization is confirmed. The United States Court of Appeals for the Seventh Circuit has discussed the rationales for this scheme: "Since a debtor is in limbo until confirmation of a plan, it is understandably difficult to commit itself to assuming or rejecting a contract

much before the time for confirmation of a plan. . . . This procedure [e]nsures that the debtor is not in the precarious position of having assumed a contract relying on confirmation of a particular plan, only to find the plan to have been rejected. . . . Finally, the purpose behind chapter 11 is to permit successful rehabilitation of debtors and to prevent a debtor from going into liquidation. . . . Debtors must be permitted a certain amount of flexibility in determining whether to assume or to reject a contract. Specific provisions of the [bankruptcy code] should be interpreted with this goal in mind. To interpret the [bankruptcy code] so as to minimize flexibility and rush the debtor into what may be an improvident decision does not further the purposes of the reorganization provisions." (Citations omitted; internal quotation marks omitted.) *Moody* v. *Amoco Oil Co.*, 734 F.2d 1200, 1215–16 (7th Cir.), cert. denied, 469 U.S. 982, 105 S. Ct. 386, 83 L. Ed. 2d 321 (1984). The Second Circuit has likewise emphasized the debtor's "paramount" right to a reasonable period of time "to appraise its financial situation and the potential value of its assets in terms of the formulation of a plan" before having to assume or reject executory contracts and leases. (Internal quotation marks omitted.) *Theatre Holding Corp.* v. *Mauro*, 681 F.2d 102, 106 (2d Cir. 1982); see also *National Labor Relations Board* v. *Bildisco & Bildisco*, supra, 465 U.S. 532 (bankruptcy code must be construed to give debtor in possession "flexibility and breathing space"); 3 A. Resnick & H. Sommer, supra, § 365.05 [5], p. 365-52 ("decision[s] to assume a long-term contract usually should be delayed until confirmation").

Consistent with these principles, it is well established that, "[o]nce the bankruptcy case is filed, the [nondebtor] is required to perform its obligations. This is true even though the debtor's performance obligation is suspended and the [nondebtor] is stayed from exercising its remedies and rights, as the debtor decides whether to assume or reject the contract." J. Daniel, "Lawyering on Behalf of the Non-Debtor Party in Anticipation, and During the Course, of an Executory Contract Counterparty's Chapter 11 Bankruptcy Case," 14 Hous. Bus. & Tax L.J. 230, 238 (2014); see also P. Marchetti, "Amending the Flaws in the Safe Harbors of the Bankruptcy Code: Guarding Against Systemic Risk in the Financial Markets and Adding Stability to the System," 31 Emory Bankr. Dev. J. 305, 337–38 (2015).

The rule articulated in *Hernandez* would render the debtor's freedoms illusory. If the bankruptcy code's protections from ipso facto clauses do not kick in until a contract has been formally assumed, then, as was the case here, a nondebtor party can circumvent those protections by simply terminating the contract immediately upon the filing of the petition, before the debtor has had an opportunity to decide whether assumption or rejection will best serve the interests of reorganiza-

tion and of the debtor's creditors. As one author has explained, "[t]he statutory framework . . . evidences a congressional intention to accord the chapter 11 [debtor in possession] a 'reasonable time' within which to decide whether to assume or reject an executory contract. It would be inconsistent with this intention to permit the [nondebtor] party to terminate the contract in the interim because of the debtor's inaction . . . ." (Footnote omitted.) D. Bordewieck, "The Postpetition, Pre-Rejection, Pre-Assumption Status of an Executory Contract," 59 Am. Bankr. L.J. 197, 205 (1985).

Furthermore, the *Hernandez* rule is in tension, if not outright incompatible, with rule 6003 of the Federal Rules of Bankruptcy Procedure. That rule provides in relevant part that, "[e]xcept to the extent that relief is necessary to avoid immediate and irreparable harm, the court shall not, within [twenty-one] days after the filing of the petition, issue an order granting . . . a motion to assume or assign an executory contract or unexpired lease in accordance with [11 U.S.C.] § 365." Fed. R. Bankr. P. 6003. If a nondebtor party were free to invoke an ipso facto clause at any time until the debtor assumed its executory contracts, then there would essentially be a three-week window at the commencement of every chapter 11 proceeding during which 11 U.S.C. § 365 (e) would not apply, rendering the statutory protections largely toothless. We doubt that Congress so intended. See *In re Whitcomb & Keller Mortgage Co.*, 715 F.2d 375, 378 (7th Cir. 1983) (noting that reorganization trustee "is entitled to a reasonable time to make a careful and informed evaluation as to possible burdens and benefits of an executory contract" and that court has authority to preserve status quo until such decision is made [internal quotation marks omitted]).

The trial court's second rationale for its conclusion that the ride-through doctrine rendered the defendant's termination of the purchase agreement effective, notwithstanding the bankruptcy code's prohibition against ipso facto clauses, was that a contract that rides through a chapter 11 proceeding has been characterized as being "unaffected by the bankruptcy filing." *In re Polysat, Inc.*, supra, 152 B.R. 890. The fact that a ride-through contract is unaffected by bankruptcy has been taken to mean that "[nondebtor] contracting parties may *then* seek redress for defaults under the contract outside the bankruptcy proceedings." (Emphasis added.) *In re Dehon, Inc.*, supra, 352 B.R. 561.

We agree with that statement of the law, insofar as (1) a contract that rides through bankruptcy remains binding on all parties, and (2) following the completion of the bankruptcy proceedings, redress for any alleged defaults may be pursued in state court if such remedy is not otherwise precluded by law. Some courts also have held that, after a bankruptcy proceeding has concluded, a nondebtor party may exercise its right to

terminate under an ipso facto clause with respect to a ride-through contract, on the theory that the rationales that led Congress to bar the enforcement of such clauses cease to apply after the reorganization process has been completed.[24] The same is presumably true of a contract that does not ride through but that, instead, revests in the debtor upon dismissal of a bankruptcy petition pursuant to 11 U.S.C. § 349 (b) (3).

The trial court went a step further, however, concluding that, when a contract rides through a chapter 11 proceeding or revests in the debtor, a *previous* purported termination that was initiated during the bankruptcy becomes effective, nunc pro tunc, upon the dismissal of the petition. The court appears to have reasoned that, because the purchase agreement was *unaffected* by the bankruptcy and the dismissal of the petition put the parties back in the positions that they occupied before the plaintiff's bankruptcy, the defendant's prior termination was effectively resurrected.

There are a number of problems with this theory. First, we are not aware of any case in which a court has retroactively revived a termination in this manner, ruling that a termination that was barred by 11 U.S.C. § 365 (e) during a bankruptcy proceeding was somehow validated and reinstated following the completion or dismissal of the action.

Second, the approach the trial court adopted would undermine the predictability and respect for parties' expectations that animate the law of contract. See *General Accident Ins. Co.* v. *Mortara*, 314 Conn. 339, 350–51, 101 A.3d 942 (2014); 1 E. Farnsworth, supra, § 1.3, p. 10. Under the trial court's theory, parties to an executory contract that is purportedly terminated at the commencement of a bankruptcy proceeding have no way of knowing whether the bankruptcy court ultimately will dismiss the case, retroactively validating the termination and excusing them from performance, or whether they must continue to perform pursuant to 11 U.S.C. § 365 (e) until the trustee elects to assume or reject the contract at the time of confirmation, as the law ordinarily requires. We perceive no benefit or advantage that would offset the apparent shortcomings of such a rule.

Third, the trial court's reasoning strikes us as somewhat incongruous. The court reasoned that, because the ride-through doctrine treats the purchase agreement as being unaffected by the bankruptcy, § 7 (b) continued in effect, as if the petition had never been filed. But, of course, the defendant could not have invoked § 7 (b) and terminated the purchase agreement unless and until the plaintiff initiated bankruptcy proceedings. We fail to understand, then, in what sense the contractual rights and status of the parties are unaffected by the bankruptcy under the trial court's resolution of the case. How can the defendant terminate the purchase

agreement on the basis of the plaintiff's bankruptcy petition and simultaneously contend that the agreement should be applied as if the petition had never been filed? See *First Security Bank of Utah* v. *Creech*, 858 P.2d 958, 965 (Utah 1993).

Fourth, we hesitate to apply the ride-through doctrine—a judicially made rule that predates adoption of the bankruptcy code—in such a manner as to alter the balancing of interests and circumvent the remedies and procedural rules intended by Congress. On the one hand, the bankruptcy code's automatic stay provisions and protection from ipso facto clauses afford significant advantages to debtors and can place nondebtor parties such as the defendant in the unenviable position of having to continue to perform under a contract that the debtor need not honor and ultimately may repudiate. On the other hand, Congress was not unsympathetic to the plight of parties in such a limbo. Nondebtor parties may petition to have the automatic stay lifted with respect to a particular executory contract. 11 U.S.C. § 362 (d) and (f) (2012); *In re Taylor Investment Partners II, LLC*, supra, 533 B.R. 843. They may petition the court to set a deadline by which the debtor must either assume or reject the contract. 11 U.S.C. § 365 (d) (2) (2012). Should the equities favor it, they even may petition *the bankruptcy court* to issue an annulment, terminating the parties' contractual obligations retroactive to an earlier date. See *In re Johnson*, 346 B.R. 190, 193–94 (B.A.P. 9th Cir. 2006) (although action in violation of automatic stay is void ab initio, even if petition is later dismissed for bad faith, after dismissal, bankruptcy court may annul stay and retroactively ratify act otherwise violative of stay); *In re Govola*, 306 B.R. 733, 737–38 (Bankr. D. Conn. 2004) (annulling automatic stay in order to validate state court order entered while stay was in effect).[25] All of these remedies are designed to mitigate, if not alleviate, the burdens on, and potential unfairness to, nondebtor parties. See J. Daniel, supra, 14 Hous. Bus. & Tax L.J. 241.

In the present case, the defendant opted not to pursue any of these statutory remedies in the bankruptcy court. Instead, it chose to unilaterally terminate the purchase agreement. That decision, as the commentators have observed, was "fraught with peril," because "[a]n injured party that chooses to exercise a right of self-help . . . by electing to terminate takes the risk that a court may later regard the exercise as precipitous." (Internal quotation marks omitted.) 2 E. Farnsworth, supra, § 8.15, p. 511; see also id., § 8.19a, p. 548 (party may inadvertently repudiate contract by demanding assurance when not justified in doing so). As the United States Court of Appeals for the Ninth Circuit explained in a related context, "[a]ll parties benefit from the fair and orderly process contemplated by the automatic stay and judicial relief procedure. Judicial toleration of an alternative procedure of self-help and post hoc justifica-

tion would defeat the purpose of the automatic stay." *In re Computer Communications, Inc.*, 824 F.2d 725, 731 (9th Cir. 1987). For all of these reasons, we conclude that 11 U.S.C. § 365 (e) rendered the defendant's purported termination of the purchase agreement ineffective, and that the trial court incorrectly concluded that the ride-through doctrine applied so as to retroactively validate the termination.

2

Lastly, we consider the defendant's argument that, regardless of whether the ride-through doctrine applies, § 7 (b) of the purchase agreement is an enforceable ipso facto clause because it falls under the auspices of 11 U.S.C. § 556, which carves out an exception to 11 U.S.C. § 365 (e) for commodity forward contracts. We conclude that the trial court properly rejected this argument.

As we discussed in part II B 1 of this opinion, 11 U.S.C. § 365 (e) generally bars the enforcement of contractual ipso facto clauses, on the theory that both the party seeking to reorganize under the protection of the bankruptcy code and its creditors ultimately will benefit if that party is permitted to retain and make full use of its contractual assets. Congress carved out an exception to this rule, however, with respect to "forward contract merchant[s]," who, for countervailing reasons of public policy, are not barred from terminating a "forward contract" agreement with a debtor who petitions for bankruptcy protection. 11 U.S.C. § 556 (2012). The present dispute requires that we define the scope of the statutory terms "forward contract" and "forward contract merchant," and, more generally, of the exception at issue.

The exception to the ban on enforcing ipso facto clauses is contained in 11 U.S.C. § 556, which provides in relevant part: "The contractual right of a commodity broker, financial participant, or *forward contract merchant* to cause the liquidation, termination, or acceleration of a commodity contract, as defined in section 761 of this title, or *forward contract* because of a condition of the kind specified in section 365 (e) (1) of this title . . . shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by the order of a court in any proceeding under this title. . . ." (Emphasis added.) The parties appear to agree that the defendant is not a commodity broker or financial participant[26] for purposes of the statute, and also that the purchase agreement is not a "commodity contract" as defined in 11 U.S.C. § 761. Their dispute concerns whether the purchase agreement is a forward contract and whether the defendant qualifies as a forward contract merchant, so as to bring the present dispute within the purview of 11 U.S.C. § 556.

The bankruptcy code defines a "forward contract,"

in relevant part, as "a contract . . . for the purchase, sale, or transfer of a commodity, as defined in section 761 (8) of this title,[27] or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade, or product or byproduct thereof, with a maturity date more than two days after the date the contract is entered into, including, but not limited to, a repurchase or reverse repurchase transaction . . . consignment, lease, swap, hedge transaction, deposit, loan, option, allocated transaction, unallocated transaction, or any other similar agreement . . . ." (Footnotes altered.) 11 U.S.C. § 101 (25) (A) (2012). To qualify as a forward contract for purposes of the exception, then, an agreement must (1) involve the sale of a commodity or something akin to a commodity, (2) be the subject of dealing in the forward contract trade, and (3) have a maturity date more than two days in the future. The bankruptcy code further defines a "forward contract merchant" as "a Federal reserve bank, or an entity the business of which consists in whole or in part of entering into forward contracts as or with merchants in a commodity . . . or any similar good, article, service, right, or interest which is presently or in the future becomes the subject of dealing in the forward contract trade." 11 U.S.C. § 101 (26) (2012). Accordingly, to qualify for the safe harbor provision of 11 U.S.C. § 556, the defendant must establish that it is a forward contract merchant and that the purchase agreement met each of the three elements of a forward contract.

The defendant contends that, under the plain language of the statute, the purchase agreement qualifies as a forward contract. It further contends that, because part of its business involved entering into such contracts, the defendant is a forward contract merchant. The argument proceeds in three steps. First, the defendant argues that the long-distance telephone services that are the subject of the purchase agreement are commodities or, at the very least, services that are similar to commodities for purposes of 11 U.S.C. § 101 (25) (A). This is so, the defendant contends, because, like other commodities, the services are fungible, they are available from numerous suppliers, and they are sold primarily on the basis of price.

Second, the defendant notes that the purchase agreement, which was executed on October 31, 2006, did not require the defendant to begin purchasing the plaintiff's long-distance services until December, 2006, and the minimum monthly purchase requirement ran through December, 2009. Therefore, the defendant argues, the purchase agreement had a future maturity date more than two days after the date of execution, regardless of whether the maturity date is understood to be the date on which the sale of services commenced or terminated. Compare *In re Mirant Corp.*, 310 B.R. 548, 565 n.26 (Bankr. N.D. Tex. 2004) (with respect to

contract for ongoing sale of goods, maturity date for purposes of 11 U.S.C. § 101 [25] [A] is date of commencement of performance), with *In re Renew Energy LLC*, 463 B.R. 475, 480–81 (Bankr. W.D. Wis. 2011) (maturity date is date on which final delivery is completed).

Third, the defendant argues that the concept of a "forward contract merchant," as defined by 11 U.S.C. § 101 (26), should be construed broadly to include any person that has entered into a forward contract: "The language 'in whole or in part' in this definition substantially broadens its coverage to include any person [who] enters into forward contracts as or with merchants in a commodity business context. Thus, arguably any person that is in need of protection with respect to a forward contract in a business setting should be covered . . . ." 5 A. Resnick & H. Sommer, supra, § 556.03 [3], p. 556-13. Because the defendant's business involved the use of forward contracts such as the purchase agreement, it argues, it qualifies as a forward contract merchant.

Notably, the defendant fails to address the statutory requirement that a contract be the subject of dealing in the "forward contract trade,"[28] a term that is not defined in the bankruptcy code. The plaintiff's counterargument centers on this deficiency in the defendant's theory. The plaintiff contends that Congress included the forward contract trade requirement in both 11 U.S.C. § 101 (25) (A) and 11 U.S.C. § 101 (26) to specify that the exception to 11 U.S.C. § 365 (e) does not extend to run-of-the-mill contracts for the purchase of goods but, instead, only to contracts that are similar to and traded in the same manner as those that are governed by the Commodity Exchange Act, 7 U.S.C. § 1 et seq., and regulated by the United States Commodity Futures Trading Commission. The plaintiff finds support for this view in other subdivisions of 11 U.S.C. § 101, which define various technical financial trading terms with reference to the forward contract trade. See, e.g., 11 U.S.C. § 101 (38) (2012) ("[t]he term 'margin payment' means, for purposes of the forward contract provisions of this title, payment or deposit of cash, a security or other property, that is commonly known in the forward contract trade as original margin, initial margin, maintenance margin, or variation margin, including mark-to-market payments, or variation payments"); 11 U.S.C. § 101 (51A) (2012) ("[t]he term 'settlement payment' means, for purposes of the forward contract provisions of this title, a preliminary settlement payment, a partial settlement payment, an interim settlement payment, a settlement payment on account, a final settlement payment, a net settlement payment, or any other similar payment commonly used in the forward contract trade"). Essentially, the plaintiff's argument is that "forward contract trade" is a technical term of art that can only be understood in the context of exchange traded

or similar over-the-counter commodity contracts.

Because the term "forward contract trade" is not defined by statute and the plain language of the bankruptcy code is susceptible to more than one reasonable interpretation, we seek guidance from the legislative history and purposes underlying the provisions at issue. See, e.g., *Board of Education* v. *Mergens*, 496 U.S. 226, 237–38, 110 S. Ct. 2356, 110 L. Ed. 2d 191 (1990). The United States Court of Appeals for the Fourth Circuit set forth much of the relevant legislative background in *In re National Gas Distributors*, *LLC*, 556 F.3d 247 (4th Cir. 2009). "Since enactment of the [bankruptcy code in] 1978 . . . Congress has provided safe harbors from the destabilizing effects of bankruptcy proceedings for parties to specified commodities and financial contracts in order to protect financial markets. To do this, Congress limited the application to these parties of [bankruptcy code] provisions such as the automatic stay and trustee avoidances of preferences and fraudulent conveyances. It was thought that financial market stabilization would be achieved under the following rationale: These exceptions or safe harbors are necessary, it is thought, for the protection of financial markets, including over-the-counter . . . markets on which most derivatives contracts are executed. Without these safe harbors, markets might suffer serious shocks—perhaps even a systemic liquidity crisis, causing markets to collapse—when debtors enter bankruptcy. Counterparties to financial contracts would find themselves subject to the automatic stay for extended periods. They would be unable to liquidate volatile contracts and thereby limit their exposure to market movements. Additionally, a debtor in bankruptcy would be free to [cherry-pick] multiple contracts with the same party. Instead of netting the contracts—i.e., setting-off losses under some contracts against gains under others *with the same counterparty*—the debtor could dispose of the contracts independently. [Profitable] contracts could be assumed; [unprofitable] contracts could be rejected. In this way, the debtor could lock-in gains on profitable contracts and (due to its insolvency) limit liability for losses under unprofitable ones. The counterparty to these contracts would find itself paying in full on the assumed contracts and receiving only a fraction of its claim on the rejected. Losses from indefinite exposure to market movements and from cherry picking could produce financial distress in the counterparty itself, forcing it to default on its own contracts with other parties. As one distressed party infects another, a domino effect could ensue, undermining the entire financial market. . . .

"This explanation appears to be an accurate description of the basis on which Congress relied to justify providing safe harbors to participants in financial derivatives markets. As the House Report in connection with the 1982 [a]mendments to the [bankruptcy code] stated:

Due to the structure of the clearing system in the commodities industry and the sometimes volatile nature of the commodities market, the [bankruptcy code], as enacted in 1978, expressly provides certain protections to the commodities market to insure the stability of the market. These protections are intended to prevent the insolvency of one commodity firm from spreading to other brokers or clearing agencies and possibly threatening the collapse of the market. . . . And similarly, in connection with the 1990 [a]mendments to the [b]ankruptcy [c]ode, the House Report stated: [United States] bankruptcy law has long accorded special treatment to transactions involving financial markets, to minimize volatility. Because financial markets can change significantly in a matter of days, or even hours, a [nonbankrupt] party to ongoing securities and other financial transactions could face heavy losses unless the transactions are resolved promptly and with finality." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 252–53.

This legislative background makes clear that the congressional purpose in carving out the exception to 11 U.S.C. § 365 (e) set forth in 11 U.S.C. § 556 was not to protect the interests of individual parties to ordinary contracts for the purchase and sale of goods and services. If the exception extended so broadly, then it would largely swallow the rule; debtors engaged in many lines of business would be prevented from making full use of their contractual assets, and creditors would suffer accordingly. Moreover, we do not perceive any reason why Congress would have afforded greater protection to companies engaged in the purchase of commodity type products and services than to companies whose business involves the purchase of more specialized, differentiated products and services. Rather, the clear intent of 11 U.S.C. § 556 was to protect a limited class of future based financial transactions, of the type most commonly associated with the use of brokers, clearing agencies, and commodities exchanges. The overriding legislative concern was that the bankruptcy of a large trading company, active in a volatile market and engaged in many such transactions, could place at financial risk its various trading partners and, ultimately, the financial markets themselves. See T. Kelch & H. Weg, "Forward Contracts, Bankruptcy Safe Harbors and the Electricity Industry," 51 Wayne L. Rev. 49, 69 (2005); P. Marchetti, supra, 31 Emory Bankr. Dev. J. 307–309.

The defendant fails to convince us that it is *that* sort of company, or that the purchase agreement is *that* sort of contract. First, it is not clear that the long-distance services at issue generally are subject to active trading and reselling, much less that the defendant itself is engaged in market type trading of telephone services. A primary source of disagreement between Global and the plaintiff, for example, seems to have been Global's

view that the plaintiff was only permitted to use the circuit for its own customers' calls and was prohibited from reselling the service to third parties.

The defendant cites to two sources for the proposition that telecommunication services are actively resold and traded like other commodities. One source, however, is a decision of the United States Bankruptcy Court for the Northern District of Texas that (1) addresses an unrelated legal question, (2) references the resale of local rather than long-distance telephone service, and (3) does not indicate that telecommunications services are traded in the same manner as, say, crude oil or pork bellies. See *In re Comm South Companies Inc.*, Docket No. 03-39496 HDH-11, 2003 U.S. Bankr. LEXIS 2314, *6–7 (Bankr. N.D. Tex. November 10, 2003). The other source is the Federal Communications Commission, which, in certain published reports dating to the early years of this century, made passing reference to "wireline bandwidth" as being "actively traded like traditional commodities such as oil, gas and grains." *In re Principles for Promoting Efficient Use of Spectrum by Encouraging the Development of Secondary Markets*, 15 F.C.C.R. 24,178, 24,185 (2000) (policy statement). The parties disagree, however, as to whether long-distance telephone services were traded in that manner from 2006 to 2009. The trial court made no findings in that regard, and, in any event, there is no suggestion that the purchase agreement itself was ever part of such a trading market. See 5 A. Resnick & H. Sommer, supra, § 556.01, p. 556-3 n.4 (noting that that, unlike typical executory contracts, forward contracts typically have readily ascertainable market values that vary in relation to external market forces).

Second, the defendant posits that the purchase agreement is akin to a commodity forward contract insofar as such contracts are used to shift or hedge against financial risk; see *In re Borden Chemicals & Plastics Operating Ltd. Partnership*, 336 B.R. 214, 220–21 (Bankr. D. Del. 2006); and one of the reasons why the defendant contracted for a fixed, three-year price commitment was to protect itself against the risk associated with changes in the price for long-distance services. Of course, on some level, the purpose of all contracts is to hedge against risk. See C. Fried, Contract as Promise: A Theory of Contractual Obligation (1981) pp. 59, 117. The legislative history makes clear, however, that 11 U.S.C. § 556 was drafted to address only those risks associated with a particular type of financial instrument: "The primary purpose of a forward contract is to hedge against possible fluctuations in the price of a commodity. This purpose is financial and risk-shifting in nature, as opposed to the primary purpose of an ordinary commodity contract, which is to arrange for the purchase and sale of the commodity. If the price of a commodity—such as crude oil or soybeans—rises or falls on some future date, the buyer or seller can

minimize the risk involved through the use of forward contracts to offset the fluctuation in price from the date of the agreement to the actual date of transfer or delivery." H.R. Rep. No. 101-484, p. 4 (1990), reprinted in 1990 U.S.C.C.A.N. 223, 226. Here, there is no indication that the defendant entered into the purchase agreement *primarily* as a financial hedge, or that wholesale long-distance rates were subject to a high degree of market price volatility during the time period in question. Rather, the defendant appears to have been more concerned with simply locking in a very favorable, below-market rate in exchange for a long-term purchase commitment. That is not the sort of hedge—and certainly not the sort of risk—that Congress was concerned about when it enacted 11 U.S.C. § 556 in order to insulate the financial markets against the effects of domino bankruptcies.[29]

Third, courts generally have held that, to qualify as a forward contract, an agreement must specify a particular quantity of goods to be delivered, or at least deliverable, on a particular date. See, e.g., *In re National Gas Distributors, LLC*, supra, 556 F.3d 260 ("[When] [t]he Wall Street Journal has used the term 'forward agreement' and provided details of the transaction, it has always described fixed quantities and prices . . . . [Nonbankruptcy] case law also accords the same meaning . . . ." [Footnote omitted.]); *In re Borden Chemicals & Plastics Operating Ltd. Partnership*, supra, 336 B.R. 222 (energy industry defines forward contract to include specified quantity of goods); see also United States Commodity Futures Trading Commission, "CFTC Glossary: A Guide to the Language of the Futures Industry," available at http://www.cftc.gov/Consumer-Protection/EducationCenter/CFTCGlossary/glossary_f (last visited November 9, 2017) (defining "[f]orward contract" as "[a] cash transaction common in many industries, including commodity merchandising, in which a commercial buyer and seller agree upon delivery of a specified quality and quantity of goods at a specified future date"). Although the purchase agreement committed the defendant to a minimum monthly purchase, it did not specify how many minutes the defendant would purchase at the agreed price and, therefore, arguably failed to satisfy this element of a forward contract.

Fourth, it is not clear to us that the services at issue in the present case were truly fungible. Even those courts that have construed the concept of a forward contract broadly have required the commodity products or services involved—and the vast majority of cases have involved products rather than services—to be essentially interchangeable. See, e.g., *In re National Gas Distributors, LLC*, supra, 556 F.3d 259 (indicating that, to qualify as commodity agreement for purposes of code, benefits and detriments of agreement must be attributable to price, rather than to factors such as

service quality). In the present case, by contrast, the defendant ultimately opted to route its calls through other, higher-cost providers, at least in part because of problems with the quality and reliability of the plaintiff's services.

Fifth, this was not a simple contract for the purchase and sale of a commodity product or service. The purchase agreement, the precise nature of which remains a matter of dispute between the parties, is a multifaceted instrument that involved, among other things, (1) the plaintiff's sale of a noncommodity, namely, level three digital signal circuits, to the defendant; see footnote 3 of this opinion; and (2) a commitment by the defendant to pay the plaintiff a minimum monthly fee regardless of whether it used the plaintiff's services. It is unclear how, if at all, per minute pricing for long-distance services under the purchase agreement was influenced by, or reflective of, these unique contractual provisions, as well as the various preexisting debts owed by the plaintiff to the defendant.[30] For all of these reasons, we conclude that the trial court properly determined that the purchase agreement is not subject to 11 U.S.C. § 556 and, therefore, that the defendant's purported termination pursuant to § 7 (b) of the purchase agreement was invalid.

The judgment of the trial court is reversed and the case is remanded for further proceedings according to law.

In this opinion the other justices concurred.

* This opinion supersedes the opinion of this court in *CCT Communications*, *Inc.* v. *Zone Telecom*, *Inc.*, 324 Conn. 654, 153 A.3d 1249 (2017), which was published on February 21, 2017.

** This case was originally argued before a panel of this court consisting of Chief Justice Rogers and Justices Palmer, Eveleigh, McDonald, Espinosa and Robinson. Following publication of our initial decision; see *CCT Communications*, *Inc.* v. *Zone Telecom*, *Inc.*, 324 Conn. 654, 153 A.3d 1249 (2017); this court granted the plaintiff's motion for reconsideration en banc. Justice D'Auria has been added to the panel and has read the briefs and appendices, and listened to a recording of the oral argument prior to participating in this decision. The listing of justices reflects their seniority status on this court as of date of the plaintiff's motion.

[1] We note that, after commencement of the present action, Zone Telecom, Inc., became ANPI Business, LLC. For the sake of clarity, references in this opinion to the defendant are to Zone Telecom, Inc.

[2] Because we agree with the plaintiff with respect to the bankruptcy questions, we need not address its other appellate claims. On remand, we expect that the trial court may consider, among other things, the following questions: (1) whether the service interruptions that the defendant experienced prior to the filing of the plaintiff's bankruptcy petition constituted a material breach of contract, in light of the contractual provisions affording the plaintiff an opportunity to cure any defaults and the various regulatory requirements to which the defendant was subject; (2) whether the defendant was justified in demanding adequate assurance before continuing to perform under the purchase agreement; and (3) whether the defendant's termination letter constituted a breach of the purchase agreement.

[3] Although the record suggests that two or more circuits were exchanged, our understanding is that only one was to be available for the defendant's use under the purchase agreement. Moreover, we note that, pursuant to the purchase agreement, the defendant paid the plaintiff $459,000, and the plaintiff also acknowledged that it owed the defendant a credit of $235,000 as a result of a prior equipment purchase loan and other debts. How exactly the credits were to be applied to the defendant's monthly purchase obliga-

tions is a subject of dispute between the parties.

[4] It bears noting that, although the trial court implied in its memorandum of decision that the plaintiff was at fault in its dispute with Global, that dispute was not at issue before the trial court. In fact, the bankruptcy court, which did adjudicate the dispute between Global and the plaintiff, ruled in favor of the plaintiff. The bankruptcy court concluded that Global had offered the plaintiff an attractive fixed price, " '[a]ll [y]ou [c]an [e]at' " plan, but almost immediately "regretted the deal" and refused to honor the agreement when the plaintiff predictably took advantage of the plan by routing a high volume of international calls through Global's circuit. See *In re CCT Communications, Inc.*, supra, United States Bankruptcy Court, Docket No. 07-10210 (SMB).

[5] The full text of § 7 (b) of the purchase agreement is set forth in part II A of this opinion.

[6] It is unclear whether this determination, which the plaintiff disputes, involved a factual finding or a legal conclusion by the trial court. Our disposition of the appeal makes it unnecessary for us to resolve that question.

[7] It is unclear why the parties did not seek to resolve the questions of federal law that now come before us during the underlying bankruptcy proceeding.

[8] The plaintiff appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[9] In addition to requesting reconsideration en banc, the plaintiff also contends in its motion that, before this court issued its sua sponte articulation order and then decided the case on the basis of the trial court's articulation, the parties should have been given an opportunity to be heard on the issues raised therein. The plaintiff argues that, pursuant to *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 84 A.3d 840 (2014), and its progeny, this court was required to afford the parties an opportunity to brief and present argument on what it characterizes as the novel issue of the proper interpretation of the trial court's articulation. We disagree.

*Blumberg Associates Worldwide, Inc.*, calls for supplemental briefing when a reviewing court raises an *unpreserved* issue *sua sponte*. See id., 161–62. That was not the case here. In its primary brief, the plaintiff argued that, although the defendant's counterclaim alleged breach for failure to provide service, the trial court found breach solely on the basis of the bankruptcy petition. The defendant disagreed, setting forth, at some length, its alternative ground for affirmance. The plaintiff then had an opportunity to respond in its reply brief. Indeed, Chief Justice Rogers questioned both parties on this very point at oral argument, expressly asking them whether further articulation was warranted. Neither *Blumberg Associates Worldwide, Inc.*, nor the other cases on which the plaintiff relies, stand for the proposition that an appellate court must offer the parties an opportunity for supplemental briefing and argument whenever the court orders an articulation sua sponte pursuant to Practice Book § 60-5, particularly when the articulation relates to an issue that already has been briefed and argued by the parties.

[10] The plaintiff explained these findings by noting that the trial court also had to award damages, costs, and attorney's fees, and that the court's factual findings and credibility determinations were potentially relevant to those issues, as well as providing the necessary background to understand the parties' dispute.

[11] The obvious flaw in this reasoning is that if the trial court misunderstood the nature of the defendant's counterclaim and thought that it alleged that filing of the plaintiff's bankruptcy petition constituted a breach of contract, then the court could have found that all the elements of the counterclaim were satisfied without finding a service-based material breach.

[12] One problem with this theory is that, although it is true that the court purported to discuss the bankruptcy with reference to count two, the court's actual statement with respect to count two was that "the *breach of contract* by the [plaintiff] occurred when it filed a voluntary bankruptcy petition . . . ." (Emphasis added.) The court's reference to a breach of contract, which was the gravamen of count one rather than count two, thus undercuts the defendant's argument.

[13] The plaintiff countered that the judgment file cannot supply analysis or conclusions that are absent from or run counter to the memorandum of decision itself. See *Wesley* v. *Schaller Subaru, Inc.*, 277 Conn. 526, 529 n.1, 893 A.2d 389 (2006) ("[w]hen there is an inconsistency between the judgment

file and the oral or written decision of the trial court, it is the order of the court that controls"). In any event, neither the judgment nor the judgment file expressly states that the court found that the plaintiff breached the purchase agreement by failure to provide service.

[14] We recognize that § 7 (d) of the purchase agreement provides: "In the event of any termination of this [a]greement by either party pursuant to [§] 7, the [nonterminating] party shall not be relieved of any of its obligations hereunder." We assume, without deciding, that this provision refers only to obligations already accrued at the time of termination, as a contrary reading would run counter to the general rule that termination of a contract discharges the remaining obligations of all parties thereto; see *Weiss* v. *Smulders*, supra, 313 Conn. 242; 2 E. Farnsworth, Contracts (3d Ed. 2004) § 8.15, pp. 511–14; and also might constitute a disproportionate forfeiture under the circumstances of this case. See *Twenty-Four Merrill Street Condominium Assn.* v. *Murray*, 96 Conn. App. 616, 624, 902 A.2d 24 (2006).

[15] This is not to say that, on remand, the finder of fact might not place greater weight on the testimony of other defense witnesses, who viewed the service interruptions as more serious impediments to the defendant's business, particularly in light of its regulatory obligations. Our point is simply that there is no indication that the trial court reached such a conclusion.

[16] Notably, the defendant appears to concede that it has never alleged that the plaintiff's bankruptcy filing constituted a breach of contract. On appeal, the defendant neither contends that the plaintiff breached the purchase agreement by filing for bankruptcy protection nor attempts to defend the decision of the trial court in this respect.

[17] The text of 11 U.S.C. § 365 (e) is set forth at part II B 1 of this opinion.

[18] No trustee was appointed in the plaintiff's bankruptcy case. *In re CCT Communications, Inc.*, supra, 420 B.R. 174. Instead, the plaintiff continued to manage the bankruptcy estate as a debtor in possession. For the purposes of 11 U.S.C. § 365, the same rules that govern bankruptcy trustees also apply to debtors in possession. See 11 U.S.C. § 1107 (a) (2012); *National Labor Relations Board* v. *Bildisco & Bildisco*, 465 U.S. 513, 517 n.2, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984).

[19] Although the trial court indicated that the United States Supreme Court also has acknowledged the doctrine in dicta, the footnote on which the court relied actually was written in a concurring and dissenting opinion authored by Justice Brennan. See *National Labor Relations Board* v. *Bildisco & Bildisco*, supra, 465 U.S. 546 n.12.

[20] Because we agree with the plaintiff that the ride-through doctrine did not create an exception to 11 U.S.C. § 365 (e) under the circumstances of the present case, we need not consider the plaintiff's alternative argument that the bankruptcy code's automatic stay provisions; see 11 U.S.C. § 362 (2012); themselves rendered the defendant's termination of the purchase agreement invalid. Compare *In re Computer Communications, Inc.*, 824 F.2d 725, 728–31 (9th Cir. 1987) (stay bars termination), with D. Bordewieck, "The Postpetition, Pre-Rejection, Pre-Assumption Status of an Executory Contract," 59 Am. Bankr. L.J. 197, 214–17 (1985) (right to terminate contract is rendered unenforceable by 11 U.S.C. § 365, not stayed by 11 U.S.C. § 362).

[21] We note that the ride-through doctrine at issue in the present case differs from the homonymous doctrine that some federal courts have applied with respect to consumer contracts at issue in chapter 7 bankruptcies. See, e.g., *In re Dumont*, supra, 581 F.3d 1104, 1108–12.

[22] We reach this question, notwithstanding our conclusion that the ride-through doctrine is inapplicable, for two reasons. First, there is sparse federal authority on the question whether the ride-through doctrine applies to cases in which the bankruptcy petition is dismissed prior to the approval of a plan, and it is possible that the Second Circuit would reach a different conclusion. Second, and more fundamentally, regardless of whether the moniker of "ride-through" fits comfortably under the procedural posture of this case, the trial court's underlying reasoning arguably still applies. Better to resolve that question on the merits than on the semantics.

[23] As with *Hernandez*, however, the court in *In re Taylor Investment Partners II*, supra, 533 B.R. 843, did not apply the ride-through doctrine under circumstances akin to those of the present case, or allow a party to an executory contract to terminate that contract during the pendency of a chapter 11 proceeding pursuant to an ipso facto clause.

[24] The conclusion that termination can be *initiated* after the completion of the chapter 11 proceedings is supported by the legislative history of 11 U.S.C. § 365 (e), which indicates that 11 U.S.C. § 365 (e) "does not limit the application of an ipso facto or bankruptcy clause to a *new* insolvency or

receivership *after the bankruptcy case is closed.* That is, the clause is not invalidated in toto, but merely made inapplicable during the case for the purposes of [disposition] of the executory contract or unexpired lease." (Emphasis added.) H.R. Rep. No. 95-595, p. 349 (1977), reprinted in 1978 U.S.C.C.A.N. 5963, 6305.

[25] The defendant's reliance on these cases for the proposition that an action taken in violation of 11 U.S.C. § 362 or 11 U.S.C. § 365 (e) is retroactively voidable upon dismissal of the bankruptcy petition is misplaced. Although a federal bankruptcy court has the authority to issue such retroactive relief; see 11 U.S.C. § 362 (d) (2012); we are not aware of any authority holding that a termination in violation of 11 U.S.C. § 365 (e) is automatically validated, nunc pro tunc, upon dismissal of the bankruptcy petition, or even that a state court possesses the authority to grant such relief. See 28 U.S.C. § 1334 (a) (2012); *In re Mirant Corp.*, 440 F.3d 238, 245 (5th Cir. 2006).

Although some courts have held that an ipso facto clause is enforceable in state court upon the dismissal of a bankruptcy proceeding, they have so held only with respect to terminations that were initiated *after* the dismissal. See, e.g., *Miller* v. *Parlor Furniture of Hickory, Inc.*, 79 N.C. App. 639, 640, 339 S.E.2d 804, appeal dismissed, 316 N.C. 732, 345 S. Ed. 2d 389 (1986); see also *Chrysler Financial Corp.* v. *Fruit of the Loom, Inc.*, Docket No. C.A. 91C-08-108-1-CV (VAB), 1993 WL 19659, *4 (Del. Super. January 12, 1993) (explaining that goal of bankruptcy code is to give debtors chance for fresh start and that allowing lessors to terminate debtor's lease immediately upon filing for bankruptcy protection would defeat this purpose), aff'd 628 A.2d 83 (Del. 1993).

[26] See 11 U.S.C. § 101 (6) (2012) (defining " 'commodity broker' "); 11 U.S.C. § 101 (22A) (defining " 'financial participant' ").

[27] Section 761 (8) of title 11 of the United States Code, in turn, provides that the term "commodity" has the same meaning for purposes of the bankruptcy code as for purposes of the Commodity Exchange Act, 7 U.S.C. § 1 et seq. "Commodity" is defined therein to include "wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions . . . and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in." 7 U.S.C. § 1a (9) (2012).

[28] The defendant may have done so in reliance on a bankruptcy treatise, Collier on Bankruptcy, which references a developing consensus that, despite the clear statutory language, the forward contract protections are available even to commodity supply contracts that are entered into outside of the forward contract market. See 5 A. Resnick & H. Sommer, supra, § 556.02 [2], p. 556-8; but see *In re Borden Chemicals & Plastics Operating Ltd. Partnership*, 336 B.R. 214, 220 (Bankr. D. Del. 2006) ("it is clear that Congress was concerned about protecting only contracts for the future delivery of goods that are the subject of trading in the forward contract market").

[29] In addition, it is not clear from the record that the fact that the defendant did not begin to take "delivery" until one month after the purchase agreement was executed reflected anything other than pragmatic considerations associated with the need to transfer control of the circuit and switch clients over from other providers. The price hedging aspect of a future delivery date, by contrast, is the sine qua non of a forward contract.

[30] It is noteworthy in this respect that, when a single master agreement governs various transactions, only some of which qualify as forward contracts, the protections afforded by 11 U.S.C. § 556 extend only to the forward contract provisions of that agreement. See 5 A. Resnick & H. Sommer, supra, § 556.02 [2], p. 556-7 and n.11. Accordingly, even if 11 U.S.C. § 556 did apply to the pricing components of the purchase agreement, it is by no means clear that the defendant would have been entitled to terminate the other provisions, such as the requirement that it make minimum monthly payments regardless of usage.