******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

FRANK BONGIORNO *v.* JOSEPH CAPONE
(AC 40205)

Sheldon, Elgo and Flynn, Js.

*Syllabus*

The plaintiff, who was a member of A Co., a limited liability company, sought to recover damages from the defendant for, inter alia, breach of contract in connection with a dispute involving the sale of the defendant's membership interest in A Co. to the plaintiff. The plaintiff and the defendant, who previously each owned a 50 percent membership interest in A Co., had signed a binding term sheet, which provided that the plaintiff would purchase the defendant's interest in A Co. for a certain sum, and that their agreement to make purchase and sale would become enforceable on the date that the term sheet was signed. Pursuant to the term sheet, the parties subsequently executed a settlement agreement, at which time the plaintiff payed the defendant the purchase price, and the defendant conveyed his interest in A Co. to the plaintiff. On the day after the term sheet was signed but before the execution of the settlement agreement, the defendant withdrew $17,000 from a checking account owned by A Co. Thereafter, the plaintiff commenced this action, alleging claims for, inter alia, breach of contract and statutory theft against the defendant based on the defendant's withdrawal of that money. Specifically, the plaintiff's breach of contract claim alleged that all assets of A Co., except for certain items of the defendant's personal property that were referenced in the term sheet, were to have remained the assets and property of A Co. when the defendant conveyed his 50 percent interest in A Co. to the plaintiff and, therefore, that the defendant had breached the provisions of the term sheet by withdrawing $17,000 from A Co.'s checking account. The matter was referred to an attorney trial referee, who filed a report recommending judgment for the plaintiff. The trial court subsequently denied the defendant's motion to dismiss the operative complaint for lack of subject matter jurisdiction, accepted the attorney trial referee's second revised report, and rendered judgment in favor of the plaintiff on his claims of breach of contract and statutory theft in accordance with that report. On the defendant's appeal to this court, *held*:

1. The defendant could not prevail on his claim that the breach of contract count should have been dismissed by the trial court for lack of subject matter jurisdiction, which was based on his assertion that the plaintiff had no standing to bring his breach of contract claim because it was A Co., and not the plaintiff, that suffered any damages as a result of the defendant's $17,000 withdrawal: the breach of contract claim did not seek damages from the defendant for losses he allegedly caused to A Co. by making an unauthorized withdrawal of money from A Co.'s checking account but, rather, sought damages for the resulting failure of the defendant to give the plaintiff full consideration for the purchase price that he had paid for the defendant's 50 percent interest in A Co., and, thus, to the extent that the defendant, by taking unilateral action to diminish the value of his membership interest before transferring it to the plaintiff in exchange for consideration, denied the plaintiff the benefit of his bargain under the contract, the plaintiff had standing, in his individual capacity, to bring an action against the defendant for breach of contract to recover compensatory damages for that lost benefit; moreover, because the plaintiff's contract with the defendant was to purchase a 50 percent interest in A Co., the loss of consideration suffered by the plaintiff due to A Co.'s loss of $17,000 in aggregate value was only one half of that amount, and, therefore, the trial court should have awarded the plaintiff damages of only $8500 instead of the full amount of the $17,000 withdrawal.

2. The trial court having lacked subject matter jurisdiction over the plaintiff's statutory theft claim, it improperly rendered judgment in favor of the plaintiff on the merits of that claim, which should have been dismissed, as the only injuries resulting from the alleged theft were suffered by A Co., and not by the plaintiff personally, and, thus, the plaintiff lacked

standing to bring that claim in his individual capacity; the statutory theft count was based entirely on the defendant's withdrawal of $17,000 from the checking account that was owned by A Co., the term sheet and the settlement agreement did not pass title to A Co.'s assets from the defendant to the plaintiff, as only the defendant's membership interest in A Co. was thereby transferred and, under the allegations as pleaded, the only injuries resulting from the defendant's conduct were suffered by A Co., and the plaintiff could not recover individually for an injury to A Co. even after he became the sole member of A Co., which, as a limited liability company, remained a distinct legal entity.

3. This court declined to review the defendant's unpreserved claim that the trial court erred in rendering judgment in favor of the plaintiff on his breach of contract claim without making conclusions of law regarding the applicability of certain waiver provisions in the settlement agreement, as that claim was never raised before the trial court, and the defendant provided no legal basis for his claim that the trial court had a duty, sua sponte, to reject the allegedly incomplete findings of the attorney trial referee regarding the subject provisions.

Argued May 22—officially released October 2, 2018

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the plaintiff withdrew certain counts of his revised complaint; thereafter, the matter was referred to an attorney trial referee, who filed a report recommending judgment for the plaintiff; subsequently, the court, *Hon. Kevin Tierney*, judge trial referee, denied the defendant's motion to dismiss, sustained in part the defendant's objection to the acceptance of the report, and remanded the matter to the attorney trial referee; thereafter, the attorney trial referee filed a revised report recommending judgment for the plaintiff; subsequently, the court remanded the matter to the attorney trial referee, who filed a second revised report recommending judgment for the plaintiff; thereafter, the court rendered judgment in accordance with the second revised report, from which the defendant appealed to this court. *Reversed in part*; *judgment directed*.

*Richard J. Rapice*, with whom, on the brief, were *Peter V. Lathouris* and *Michael P. Longo, Jr.*, for the appellant (defendant).

*Mark F. Katz*, for the appellee (plaintiff).

*Opinion*

SHELDON, J. The defendant, Joseph Capone, appeals from the judgment of the trial court, rendered in accordance with the second revised finding of facts and report of an attorney trial referee (referee) to whom this case was referred for trial, awarding the plaintiff, Frank Bongiorno: compensatory damages of $17,000 on the plaintiff's claim of breach of contract, plus statutory prejudgment interest on that sum, under General Statutes § 37-3a, at the rate of 10 percent per annum; and treble damages of $51,000 on the plaintiff's claim of statutory theft under General Statutes § 52-564, less $17,000 to avoid duplication of the damages awarded for breach of contract.[1] The defendant claims that the court improperly: (1) concluded that the plaintiff had standing in his individual capacity to pursue claims of breach of contract and statutory theft against the defendant based upon his withdrawal of $17,000 from the checking account of AAA Advantage Carting & Demolition Service, LLC (company), a limited liability company in which the defendant had a 50 percent membership interest that he had agreed to sell to the plaintiff for $200,000 on the basis of a binding term sheet that did not authorize the challenged withdrawal; (2) rendered judgment in favor of the plaintiff on the merits of his breach of contract claim without making legal conclusions as to the applicability of the waiver-of-suit provisions in the contractual documents to that claim; and (3) rendered judgment in favor of the plaintiff on the merits of his statutory theft claim.[2]

We agree with the defendant that the plaintiff lacked standing, in his individual capacity, to bring an action against him in this case to recover damages for losses he allegedly caused to the company. On that basis, we conclude that both the plaintiff's statutory theft claim and that portion of his breach of contract claim, in which he sought compensatory damages for diminishing the value of his own preexisting 50 percent interest in the company, rather than the other 50 percent interest in the company that he agreed to purchase under the contract, must be dismissed for lack of subject matter jurisdiction. To the extent, however, that the plaintiff sought damages from the defendant for losses he personally suffered due to the defendant's withdrawal of $17,000 from the company's account based on the resulting diminution in value of the 50 percent interest in the company that the defendant had agreed to sell him in exchange for his payment of $200,000, we find that the plaintiff had standing to prosecute that claim. Even so, although the defendant admittedly failed to raise before the trial court, and thus to preserve for appellate review, his only present challenge to the merits of that judgment, we further conclude that the amount of that judgment on the plaintiff's breach of contract claim must be reduced, in light of our jurisdic-

tional ruling, to reflect the true extent of the proven diminution in value of the company resulting from the defendant's $17,000 withdrawal from it that he had standing, in his individual capacity, to recover as damages in this case. Because the proven diminution of the company's aggregate value that resulted from the defendant's withdrawal was $17,000, the resulting diminution in value of the 50 percent interest in the company that he received from the defendant in consideration for his payment was only one half of that amount, or $8500. We, thus, reverse the court's judgment for the plaintiff on his breach of contract claim, as to damages only, and remand this case with direction to render judgment for the plaintiff on that claim in the modified amount of $8500, plus prejudgment statutory interest on that sum, of 10 percent per annum, from the date on which the defendant's transfer of interest to the plaintiff became final until the date of judgment.

The following facts and procedural history are relevant to our review. The plaintiff and the defendant are brothers-in-law. For many years, both owned 50 percent interests in the company. In 2012, however, they decided to end their business relationship. To that end, the plaintiff and the defendant signed two documents by which they agreed that the defendant would convey his 50 percent interest in the company to the plaintiff for the sum of $200,000. The parties first signed a "binding term sheet" on August 28, 2012, which provided that the plaintiff would purchase the defendant's interest in the company for $200,000, and that their agreement to make purchase and sale became enforceable on that date. Pursuant to the term sheet, the parties agreed to execute a "settlement agreement" no later than September 7, 2012, at which time the plaintiff would pay the defendant the agreed upon purchase price, and the defendant would convey his 50 percent interest in the company to the plaintiff. Although the term sheet did not specifically define what was to be included in the company's assets as of that date, August 28, 2012, it did specify that the defendant's attorneys were to send to the plaintiff's attorneys a list of all of the defendant's personal property then located in the company offices, that the defendant must remove such property by September 1, 2012, and that the defendant must remove all confidential or trade secret information of the company from his personal files.[3] The term sheet did not include a reference to any checking account belonging to the company.

On September 7, 2012, the parties executed a settlement agreement, which expressly incorporated the term sheet and its provisions. The settlement agreement provided that, upon its execution, the plaintiff would purchase from the defendant, and the defendant would sell to the plaintiff, the defendant's 50 percent interest in the company for the purchase price of $200,000,[4] and that upon the delivery of the purchase price to the

defendant, he would execute and deliver to the plaintiff an assignment of his membership interest, irrevocably transferring his 50 percent interest in the company to the plaintiff. The settlement agreement further provided that the defendant would deliver certain specific property to the plaintiff at the time of transfer, or as soon as possible thereafter.[5] The settlement agreement provided that, immediately following the transfer of his membership interest, the defendant would have no ownership or any other interest in the company and no authority to act on the company's behalf, and that he would be deemed to have resigned from any and all positions within the company. The settlement agreement also included provisions as to mutual special releases and remedies. The parties released each other from any and all actions against each other relating to the company, except with respect to any breach of the settlement agreement or the term sheet.[6] The parties agreed that, should a party breach the settlement agreement or the term sheet, the nonbreaching party would not be prohibited from pursuing or being entitled to available redress, including the recovery of damages.[7]

On August 29, 2012, the day after the binding term sheet was signed, the defendant withdrew $17,000 from a checking account owned by the company. On September 7, 2012, the parties executed the settlement agreement, and the defendant signed an assignment of membership interest, conveying all of his rights, title and interest in his 50 percent membership interest in the company to the plaintiff in exchange for the purchase price of $200,000.

The plaintiff commenced this action against the defendant by causing him to be served with a writ, summons and complaint on September 28, 2012. On December 10, 2012, in response to the defendant's request to revise, the plaintiff filed a revised complaint, which thereby became the operative complaint in this action. The operative complaint initially included the following claims: (1) breach of contract; (2) violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.; (3) conversion; (4) statutory theft in violation of § 52-564; and (5) breach of contract as to Diaz Boncap, LLC.[8] The plaintiff later withdrew his claim under CUTPA and his breach of contract claim as to Diaz Boncap, LLC.

In his first count, pleading breach of contract, the plaintiff alleged that all assets of the company, except for items of the defendant's personal property that were referenced in the term sheet, were to have remained the assets and property of the company when the defendant conveyed his 50 percent interest in the company to the plaintiff pursuant to the settlement agreement. He therefore claimed that the defendant had breached the provisions of the term sheet by withdrawing $17,000 from the company checking account on August 29, 2012.

The defendant subsequently filed an answer in which he denied all material allegations of the operative complaint and asserted seven special defenses, including that the plaintiff had suffered no actual damages as a result of the defendant's challenged $17,000 withdrawal. The plaintiff denied all of the defendant's special defenses.

The matter was ultimately referred for trial to a referee, who conducted the trial on June 24, 2015. The documentary evidence presented at trial included: the binding term sheet, the settlement agreement, a copy of the withdrawal slip for the $17,000, a list of personal items to be removed from the company by the defendant, a Sprint phone bill, a Sprint account history, and a spreadsheet of financial distributions from the company to the plaintiff and the defendant. The plaintiff and the defendant both testified at the trial.

The plaintiff testified that he and the defendant had entered into an agreement on August 28, 2012, under which the defendant agreed to convey his 50 percent interest in the company to the plaintiff. He further testified that the document dated August 28, 2012, was a binding term sheet that memorialized generally his agreement with the defendant, and that another document, dated September 7, 2012, was a more formalized agreement in which he and the defendant agreed on the details of the transfer of the defendant's 50 percent interest. The plaintiff and the defendant arrived at the purchase price of $200,000 by considering "[t]he amount in the [company's] checkbook . . . the amount of receivables owed to the company, the amount of payables paid out, and [the value] of the equipment" prior to the sale of the company. The plaintiff testified that the term sheet provided that the defendant would be permitted to remove all of his personal property from the company's offices after he furnished a list of such property, and that the defendant had in fact come to the offices on August 28, 29 and 30, 2012, to clear out his computer and personal items.

The defendant withdrew $17,000 from the company's account on August 29, 2012. The plaintiff never authorized the withdrawal, and the defendant never told the plaintiff that he intended to make the withdrawal. The plaintiff confirmed that the checking account from which the defendant made the withdrawal belonged to the company and was not the plaintiff's personal checking account. The plaintiff further testified that, pursuant to the term sheet, he believed that the defendant's ownership in the company had ended on August 28, 2012. He contended, on that basis, that the defendant's August 29, 2012 withdrawal constituted theft.

According to the plaintiff, he and the defendant had adopted a standard business practice for making withdrawals from the company checking account. In accordance with that practice, he and the defendant would

compensate themselves from the income of the company, as deposited in the account, by taking weekly disbursements of $1000, "if the checkbook . . . allow[ed] it," but they would not take such disbursements on the weeks when the company did not have sufficient funds in the account with which to make them. They did not pay themselves retroactively for any missed weeks. The plaintiff and the defendant also made withdrawals from the company account to support other property they jointly owned; the plaintiff characterized such withdrawals as capital contributions. Payments from the company account always were made equally to the plaintiff and the defendant, with the exception of reimbursements for minor business purchases that they made. At the end of the year, based upon their accountant's determination, the plaintiff and the defendant would issue a check from the company account to the defendant in an amount representing the taxes he was required to pay on his income from the company that year, and a check to the plaintiff in an identical amount.[9] The plaintiff testified that these tax reimbursement withdrawals were not made in years when their tax burdens were very low. The plaintiff testified that the company's business financial records contained no entry documenting the defendant's $17,000 withdrawal from the company checking account.[10]

The plaintiff claimed that the effective date of the transfer of the defendant's interest in the company to him was August 28, 2012, pursuant to the binding term sheet. He confirmed, however, that the actual closing date for the sale of the defendant's 50 percent interest in the company to him was September 7, 2012. Although before the binding term sheet was signed, the defendant had taken care of the bills and finances of the company, after it was signed, the plaintiff's secretary took care of all deposits and the plaintiff's son wrote all the checks. The plaintiff reiterated that the defendant did not engage in the company business activity after August 28, 2012.

In his testimony, the defendant admitted that, although he had signed the binding term sheet on August 28, 2012, he withdrew $17,000 from the company's checking account on August 29, 2012. The defendant confirmed that there was no mention of the $17,000, or of his right to receive that sum from the company, in either the binding term sheet or the settlement agreement. He testified that $9000 of the $17,000 he withdrew from the company account represented nine weeks of $1000 disbursements that he had taken retroactively to make up for weeks when no disbursements could be made because there were insufficient funds in the account with which to make them. He testified that the other $8000 of the $17,000 withdrawal had been taken to cover his estimated tax burden on income he had received from the company from January

1 through August 30, 2012. He claimed that it was a standard business practice for him to withdraw money from the account in this way for tax reimbursement purposes. According to the defendant, the account contained approximately $60,000 when he made the $17,000 withdrawal from it, but he did not tell the plaintiff about the withdrawal because he and the plaintiff were not communicating at the time. He claimed that he was still working for the company until sometime between August 29 and September 7, 2012. He also claimed that he was conducting normal business operations for the company, including making out checks, until September 7, 2012, and thus, that his duties at the company did not cease, and he was not out of the company, until that date.

On November 5, 2015, the referee filed his first report and a motion for acceptance of the report and the entry of judgment in accordance therewith. In the report, the referee first found that, although the settlement agreement was executed approximately one week after the parties signed the term sheet, the provisions of the term sheet had become binding and enforceable as of August 28, 2012. The term sheet provided that the actual transfer of the defendant's interest in the company to the plaintiff was to occur no later than September 7, 2012. The referee further found that, at the time the term sheet was signed, on August 28, 2012, the price the parties had agreed to for the plaintiff's purchase of the defendant's 50 percent interest in the company had been based in material part upon a valuation of the company's assets on the date the term sheet became enforceable, which included all the cash in the company account from which the defendant made the $17,000 withdrawal on August 29, 2012. The referee found, on that basis, that the defendant had breached his contract with the plaintiff by taking money from the company account that he had agreed would remain the property of the company at the time his 50 percent interest in the company was transferred to the plaintiff. Reasoning further that, upon the completion of the sale pursuant to the parties' contract, the plaintiff would become the sole owner of the company and, thus, of all of its assets, the referee awarded the plaintiff the full value of the defendant's $17,000 withdrawal to compensate him for diminution in the value of the consideration he received from the defendant for his payment of $200,000, plus prejudgment statutory interest on that amount pursuant to § 37-3a, from the date of the withdrawal until the date of judgment at the rate of 10 percent per annum. Although acknowledging implicitly that the actual transfer of the defendant's interest in the company did not take place until September 7, 2012, when the settlement agreement was signed and the plaintiff paid the defendant the sum of $200,000, the referee found that the defendant's ownership rights in the company ceased to exist on August 28, 2012. Therefore, further finding that

the defendant's actions in withdrawing the $17,000 had been taken with the intent to deprive the plaintiff, as the sole member of the company upon completion of the parties' contract, of the money so withdrawn, he found that the plaintiff met his burden of proof as to his claims of conversion and statutory theft, and he awarded the plaintiff treble damages of $51,000 for statutory theft, pursuant to § 52-564.[11]

The defendant filed an objection to the referee's report and a memorandum in opposition to the motion to accept that report on November 23, 2015, in which he argued, inter alia, that the referee had failed to file the report in compliance with Practice Book § 19-8 because the report was formatted as a memorandum of decision and did not set forth in separately and consecutively numbered paragraphs the ultimate facts found and the conclusions drawn therefrom; the conclusions of facts in the first report were not properly reached on the basis of the subordinate facts found; and the referee reached incorrect legal conclusions, including that the plaintiff had a sufficient personal property interest in the $17,000 withdrawn by the defendant to support his individual claims for damages. The defendant also filed a motion to dismiss the operative complaint for lack of subject matter jurisdiction, claiming that the $17,000 the defendant had withdrawn from the company account belonged to the company rather than to the plaintiff individually and, thus, that the plaintiff, who had brought suit in his individual capacity only, lacked standing to maintain any claim for damages based upon that withdrawal.

By order and memorandum of decision dated February 22, 2016, the court declined to accept the referee's report. The basis for its ruling was that the report did not comply with the requirements of Practice Book § 19-8 for referee reports. The court therefore ordered the referee to redraft his report within 120 days of its order. By a separate memorandum of decision issued on that same day, the court denied the defendant's motion to dismiss, ruling that, by claiming that the plaintiff was not the proper party to commence or prosecute this action, "the defendant [had sought] a remedy more appropriate for a motion to strike, the failure to join the proper party." The court found that the only two parties to the contracts at issue were the plaintiff and the defendant, that each party had previously owned a 50 percent interest in the assets of the company, which included the checking account from which the defendant had withdrawn the $17,000, and thus, when the transaction by which the plaintiff purchased the defendant's interest in the company was completed, the plaintiff would own all the assets of the company, including the checking account in question. The court held for that reason that the plaintiff had pleaded a "colorable claim of direct injury" on the basis of the defendant's withdrawal, and so it denied the defendant's motion to

dismiss. (Internal quotation marks omitted.)

On May 26, 2016, the referee filed his revised findings of fact and report. On June 14, 2016, the defendant filed an objection to the revised report and a memorandum in support of his objection, claiming, inter alia, that the revised report failed to comply with Practice Book § 19-8 by failing to set forth facts sufficient for the court to make a determination on the plaintiff's first, third and fourth causes of action, and reiterating his claim that the plaintiff had failed to prove that he had a sufficient property interest in the $17,000 the defendant had withdrawn from the company account to support his individual claims for money damages against the defendant. By order and memorandum of decision dated August 3, 2016, the trial court declined to accept the revised report because it did not state the standard of proof the referee had used in rendering his factual findings on the plaintiff's claim of statutory theft and did not cite the legal authority upon which the referee was relying in recommending an award of statutory interest, or recommend a rate at which such interest should be awarded.[12] The court therefore ordered the referee to submit a new report within 120 days after conducting whatever further proceedings he deemed necessary for that purpose.

On October 20, 2016, the referee held a conference in which the parties' counsel both participated, during which the referee offered the defendant an opportunity to schedule a further hearing on the issue of prejudgment statutory interest. After counsel conferred with one another on the issue, they reported that the defendant would not request a further hearing on the issue of interest and, thus, asked the referee to prepare his second revised report based solely upon the evidence presented at trial.

On December 2, 2016, the defendant filed a preemptive objection to the referee's second revised report, arguing that it would not be filed, as the court had ordered, within 120 days of August 3, 2016. The referee filed his second revised report[13] on December 6, 2016, along with a motion for acceptance of the report and the entry of judgment in accordance therewith. On December 23, 2016, the defendant filed a second objection to the second revised report, claiming not only that the report had been filed beyond the court ordered deadline, but that it was objectionable in substance for the reasons stated in his objections to the referee's prior reports.

On February 27, 2017, the court accepted the referee's second revised report and rendered judgment in favor of the plaintiff in accordance with that report. As for the defendant's objection based on timeliness, the court ruled that, although 120 days from August 3, 2016, was indeed December 1, 2016, the report had been timely filed because the 120 day period for filing it did not

begin to run until October 20, 2016, the date of his final conference with counsel. As for the defendant's other objections, the court refused to revisit the issues decided in its earlier memorandum of decision denying the defendant's motion to dismiss, dated November 25, 2015. The court then adopted the referee's findings on the merits without independent analysis. The court therefore found that the facts found by the referee established the plaintiff's right to judgment in his favor on his claim of breach of contract, in the amount of $17,000 in compensatory damages, plus prejudgment statutory interest on that sum at the rate of 10 percent per annum, and on his claim of statutory theft, treble damages in the amount of $51,000, less $17,000 as duplicative of the damages awarded for breach of contract. Accordingly, it rendered judgment in the plaintiff's favor on those counts. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court erred in determining that the plaintiff had standing to maintain this action. We conclude that the plaintiff had standing to maintain his breach of contract claim. We agree with the defendant, however, that the plaintiff lacked standing to bring a statutory theft claim on the facts of this case.

"Standing is the legal right to set judicial machinery in motion." (Internal quotation marks omitted.) *Ma'Ayergi & Associates, LLC* v. *Pro Search, Inc.*, 115 Conn. App. 662, 667, 974 A.2d 724 (2009). "The issue of standing implicates a court's subject matter jurisdiction and is subject to plenary review. . . . Standing is established by showing that the party claiming it is authorized by statute to bring suit or is classically aggrieved. . . . The fundamental test for determining aggrievement encompasses a well-settled twofold determination: first, the party claiming aggrievement must successfully demonstrate a specific, personal and legal interest in [the subject matter of the challenged action], as distinguished from a general interest, such as is the concern of all members of the community as a whole. Second, the party claiming aggrievement must successfully establish that this specific personal and legal interest has been specially and injuriously affected by the [challenged action]." (Citation omitted; internal quotation marks omitted.) *Channing Real Estate, LLC* v. *Gates*, 326 Conn. 123, 137, 161 A.3d 1227 (2017). "Standing requires no more than a colorable claim of injury; a [party] ordinarily establishes . . . standing by allegations of injury. Similarly, standing exists to attempt to vindicate arguably protected interests." (Internal quotation marks omitted.) *Ma'Ayergi & Associates, LLC* v. *Pro Search, Inc.*, supra, 667.

"Subject matter jurisdiction involves the authority of the court to adjudicate the type of controversy pre-

sented by the action before it. . . . [A] court lacks discretion to consider the merits of a case over which it is without jurisdiction . . . . The subject matter jurisdiction requirement may not be waived by any party, and also may be raised by a party, or by the court sua sponte, at any stage of the proceedings, including on appeal." (Internal quotation marks omitted.) *O'Reilly* v. *Valletta*, 139 Conn. App. 208, 212–13, 55 A.3d 583 (2012), cert. denied, 308 Conn. 914, 61 A.3d 1101 (2013).

"[I]t is the burden of the party who seeks the exercise of jurisdiction in his favor . . . clearly to allege facts demonstrating that he is a proper party to invoke judicial resolution of the dispute. . . . One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . [A]s a general rule, a plaintiff lacks standing unless the harm alleged is direct rather than derivative or indirect. . . .

"The requirement of directness between the injuries claimed by the plaintiff and the conduct of the defendant also is expressed, in our standing jurisprudence, by the focus on whether the plaintiff is the proper party to assert the claim at issue. . . . Thus, to state these basic propositions another way, if the injuries claimed by the plaintiff are remote, indirect or derivative with respect to the defendant's conduct, the plaintiff is not the proper party to assert them and lacks standing to do so. [When], for example, the harms asserted to have been suffered directly by a plaintiff are in reality derivative of injuries to a third party, the injuries are not direct but are indirect, and the plaintiff has no standing to assert them." (Internal quotation marks omitted.) *Padawer* v. *Yur*, 142 Conn. App. 812, 816–17, 66 A.3d 931, cert. denied, 310 Conn. 927, 78 A.3d 145 (2013); see also *O'Reilly* v. *Valletta*, supra, 139 Conn. App. 213–14.

A

"The elements of a breach of contract claim are the formation of an agreement, performance by one party, breach of the agreement by the other party, and damages." (Internal quotation marks omitted.) *CCT Communications, Inc.* v. *Zone Telecom, Inc.*, 327 Conn. 114, 133, 172 A.3d 1228 (2017). For a plaintiff to have standing to bring an action seeking damages for breach of contract, he must allege and prove that he was a party to the contract and, thus, was entitled to enforce the contract for his own benefit, and that the other party's breach of the contract caused him to suffer damages in his individual capacity.

On appeal, the defendant argues that the plaintiff had no standing to bring this claim because it was the company, and not the plaintiff, that suffered any damages as a result of his $17,000 withdrawal. In his breach

of contract claim, however, the plaintiff did not seek damages from the defendant for losses he allegedly caused to the company by making an unauthorized withdrawal of money from it, but rather sought damages for the resulting failure of the defendant to give him full consideration for the $200,000 he had paid for the defendant's 50 percent interest in the company, with the understanding that the company's aggregate assets at the time of transfer would be those owned by the company on August 28, 2012. The parties' contract for the defendant to sell that membership interest to the plaintiff was a personal undertaking between them to which the company was not itself a party. The membership interest thereby purchased was personal property that the defendant had the right to sell to the plaintiff, and the plaintiff had the right to receive, own, enjoy, and dispose of as he wished. See General Statutes (Rev. to 2011) § 34-169.[14] Therefore, if and to the extent that the defendant, by taking unilateral action to diminish the value of that membership interest before transferring it to the plaintiff in exchange for his agreed upon payment for it, denied the plaintiff the benefit of his bargain under the contract, the plaintiff had standing, in his individual capacity, to sue the defendant for breach of contract to recover compensatory damages for that lost benefit.

The referee found that the $17,000 withdrawn by the defendant from the company checking account was among the assets the parties had agreed, under the binding term sheet, would remain the property of the company at the time the defendant's 50 percent interest in the company was transferred to the plaintiff. To make the plaintiff whole for this failure of consideration, the court awarded the plaintiff the full amount of that withdrawal as compensatory damages for the company's lost value, plus prejudgment statutory interest on that sum, from the date of the withdrawal to the date of judgment.

Because, however, the plaintiff's contract with the defendant was to purchase only a 50 percent interest in the company, the loss of consideration suffered by the plaintiff due to the company's loss of $17,000 in aggregate value was only one half of that amount, or $8500. The plaintiff's damages for breach of contract must, therefore, be reduced to $8500. Accordingly, we thus reverse the court's judgment for the plaintiff on his breach of contract claim as to damages only, and remand this case with direction to render judgment for the plaintiff on that claim in the amount of $8500, plus prejudgment interest of 10 percent per annum on that sum from the date the undervalued interest was transferred until the date of judgment.[15]

B

"Section 52-564 provides: Any person who steals any property of another, or knowingly receives and con-

ceals stolen property, shall pay *the owner* treble his damages. We consistently have held that [s]tatutory theft under § 52-564 is synonymous with larceny under General Statutes § 53a-119. . . . A person commits larceny within the meaning of . . . § 53a-119 when, with intent to deprive another of property or to appropriate the same to himself or a third person, he wrongfully takes, obtains or withholds such property from *an owner. An owner* is defined, for purposes of § 53a-119, as any person who has a right to possession superior to that of a taker, obtainer or withholder. General Statutes § 53a-118 (a) (5)." (Citations omitted; emphasis added; internal quotation marks omitted.) *Rana* v. *Terdjanian*, 136 Conn. App. 99, 113–14, 46 A.3d 175, cert. denied, 305 Conn. 926, 47 A.3d 886 (2012).

"A limited liability company is a distinct legal entity whose existence is separate from its members. . . . A limited liability company has the power to sue or to be sued in its own name; see General Statutes [Rev. to 2011] §§ 34-124 (b) and 34-186; or may be a party to an action brought in its name by a member or manager. See General Statutes [Rev. to 2011] § 34-187."[16] (Citation omitted.) *O'Reilly* v. *Valletta*, supra, 139 Conn. App. 214; see also *Padawer* v. *Yur*, supra, 142 Conn. App. 817; *Wasko* v. *Farley*, 108 Conn. App. 156, 170, 947 A.2d 978, cert. denied, 289 Conn. 922, 958 A.2d 155 (2008). "General Statutes [Rev. to 2011] § 34-167 (a) clearly establishes that [p]roperty transferred to or otherwise acquired by a limited liability company is property of the limited liability company and not of the members individually and that [a] member has no interest in specific limited liability company property."[17] (Internal quotation marks omitted.) *Mukon* v. *Gollnick*, 151 Conn. App. 126, 132, 92 A.3d 1052 (2014).

"A member or manager . . . may not sue in an individual capacity to recover for an injury based on a wrong to the limited liability company. . . . [A] member or manager of a limited liability company is not a proper party to a proceeding by or against a limited liability company solely by reason of being a member or manager of the limited liability company, except where the object of the proceeding is to enforce a member's or manager's right against or liability to the limited liability company or as otherwise provided in an operating agreement . . . ." (Internal quotation marks omitted.) *Padawer* v. *Yur*, supra, 142 Conn. App. 817–18; see also *O'Reilly* v. *Valletta*, supra, 139 Conn. App. 214–15; *Wasko* v. *Farley*, supra, 108 Conn. App. 170.

This court has repeatedly held that damages suffered by a limited liability company cannot be recovered by a member of the limited liability company bringing the case in an individual capacity. In *Wasko* v. *Farley*, supra, 108 Conn. App. 170–71, because the plaintiff brought the action in her individual capacity and the limited

liability company was not a party, damages incurred by the limited liability company were not at issue in the case, and we held that the court properly declined to instruct the jury on damages resulting from additional costs incurred by the limited liability company. In *Ma'Ayergi & Associates, LLC* v. *Pro Search, Inc.*, supra, 115 Conn. App. 666, we disagreed with the plaintiff's argument that he had standing as an individual to assert all causes of action on behalf of his companies because he was the sole member of those companies. "[A] corporation is a separate legal entity, separate and apart from its stockholders. . . . It is an elementary principle of corporate law that . . . corporate property is vested in the corporation and not in the owner of the corporate stock. . . . That principle also is applicable to limited liability companies and their members." (Internal quotation marks omitted.) Id. In *Padawer* v. *Yur*, supra, 142 Conn. App. 818, we held that "[a]lthough the plaintiff [was] the sole member of [the limited liability company], that [did] not impute ownership of the limited liability company's assets to the plaintiff," and that the plaintiff's position as the sole member "[did] not provide him with standing to recover individually for harm to the limited liability company." In *O'Reilly* v. *Valletta*, supra, 139 Conn. App. 216, we held that the plaintiff "lacked the requisite direct personal interest in the lease, the leased premises or the restaurant business conducted by his [limited liability] company on those premises to confer standing on him to complain of any breach of the lease or of any harm to the business resulting therefrom" and, therefore, that "[t]he claim should have been dismissed for lack of subject matter jurisdiction . . . ."

In the present case, the statutory theft count is based entirely on the defendant's withdrawal of $17,000 from the company's checking account. The facts demonstrate that it is the company, and not the plaintiff, that would have standing to assert a statutory theft claim on the basis of the defendant's conduct. The plaintiff has not demonstrated a specific, personal and legal interest in the money separate from that of the company. The company owned the checking account from which the money was taken. The trial court's finding that the term sheet and the settlement agreement passed title to the company business assets from the defendant to the plaintiff is incorrect; only the defendant's membership interest in the company was thereby transferred. Under these allegations, the only injuries resulting from the defendant's conduct, as stated in the plaintiff's statutory theft count, were suffered by the company, not by the plaintiff personally. The company is a limited liability company and is, therefore, a distinct legal entity from the plaintiff, who is simply a member of that entity. Even after the plaintiff became the sole member of the company, the company remained a distinct legal entity. Because a member of a limited liability

company cannot recover for an injury allegedly suffered by the limited liability company, we conclude that the plaintiff lacked standing to pursue a claim of statutory theft in this case. Accordingly, we conclude that the trial court lacked subject matter jurisdiction over the plaintiff's statutory theft claim. The court improperly rendered judgment for the plaintiff on the merits of his statutory theft claim. The claim should have been dismissed for lack of subject matter jurisdiction rather than decided on its substantive merits.

The judgment for the plaintiff on his statutory theft claim is reversed because the plaintiff lacked standing to bring it in his individual capacity. This case is remanded with direction to dismiss that claim for lack of subject matter jurisdiction.

## II

The defendant next claims that the trial court erred in rendering judgment in favor of the plaintiff on his breach of contract claim without making conclusions of law as to the applicability of the waiver-of-suit provisions in the contractual documents. The defendant contends that, pursuant to the settlement agreement, the parties agreed to "forever release, remise, acquit, waive and discharge . . . [the] other party . . . from any and all actions, causes of action, suits, debt, dues, sums of money . . . trespasses, damages . . . claims and demands whatsoever, in law or in equity, which against a party . . . [or another party] ever had, now have or hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of [the settlement] agreement . . . [except with respect to any breach of this agreement or the term sheet]." (Internal quotation marks omitted.); see footnote 6 of this opinion. He argues that the execution of the settlement agreement resulted in a waiver of any claims that relate to his conduct on or before September 7, 2012, and, thus, that the plaintiff would only have a cause of action against him if the plaintiff sought to enforce any claim made in a previous litigation or sought to enforce the provisions of the term sheet and the settlement agreement. The plaintiff argues that the defendant has failed to preserve this issue for appellate review by not filing a transcript of the hearing before the referee in accordance with Practice Book § 19-14. The defendant did file the transcript of the hearing before the referee on November 23, 2015. We conclude, however, that the defendant failed to preserve this issue for our review by not raising it before the trial court.

After a thorough review of the record, we find that the defendant did not raise this defense at any time before the trial court. In his appellate brief, in fact, the defendant concedes that he did not raise this defense at the time of trial. He argues, however, that the trial court had a duty, sua sponte, to reject the allegedly

incomplete factual finding of the referee regarding the alleged waiver-of-suit provisions of the contract documents. The defendant provides no legal basis for this assertion.

Pursuant to Practice Book § 60-5, we are not bound to consider a claim that was not distinctly raised at trial. Thus, we decline to address this claim.

The judgment is reversed in part and the case is remanded with direction to render judgment for the plaintiff on his claim of breach of contract in the modified amount of $8500, plus prejudgment statutory interest on that sum from the time the settlement agreement was executed until the time of judgment, at the rate of 10 percent per annum, and to render judgment dismissing the plaintiff's statutory theft claim for lack of subject matter jurisdiction; the judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] The plaintiff's complaint also pleaded claims of violation of the Connecticut Unfair Trade Practices Act, General Statutes § 42-110a et seq., and breach of contract involving a separate company, Diaz Boncap, LLC. The plaintiff withdrew those claims prior to trial. Additionally, the plaintiff's complaint pleaded a claim of conversion. The trial court found that this claim was moot because damages for conversion and statutory theft cannot be separately awarded based upon the taking of the same sum of money; it therefore found for the defendant on that count. The plaintiff also claimed in his first count that the defendant had failed to transfer two cell phone numbers to him. The referee found in favor of the defendant on that claim, and the court upheld the decision. It is not an issue on appeal.

[2] In his brief, the defendant also claimed that the court erred in rendering judgment in favor of the plaintiff on the plaintiff's claim of conversion. This claim is unfounded, as the defendant makes no mention of conversion in his argument, and the court determined that the plaintiff's conversion claim was moot. See footnote 1 of this opinion.

We do not address the defendant's third claim in this opinion because that claim is rendered unnecessary by our resolution of his first claim.

[3] The full provision provides as follows: "No later than 3:00 p.m. on Friday, August 31, 2012, [the defendant's] attorneys shall transmit to [the plaintiff's] attorneys a list of all personal property belonging to [the defendant] that [the defendant] intends to remove from [the company's] offices. [The defendant] shall have the right to remove all books and records of Boncap Realty, LLC, Boncap Recycling, LLC, and Plymouth Boncap, LLC, necessary for managing and operating such entities pursuant to Section 9 below. [The plaintiff] shall be entitled to copies of all such documents at the expense of the respective entity whose documents are copied. [The defendant] shall remove all such items from [the company's] offices no later than 5:00 p.m. on Saturday, September 1, 2012. [The plaintiff] may observe the removal. Thereafter, [the defendant] shall have no rights to occupy [the company's] offices. If there is a dispute as to what items [the defendant] may remove from [the company's] offices, such dispute shall be submitted to the Mediator for a final, binding and non-appealable decision to be rendered no later than [September 7, 2012]. [The defendant] shall remove any confidential or trade secret information of [the company] from his personal files. However, [the defendant] shall have access in the future to any [company] information necessary for tax, financial or legal purposes pertaining to the period of his ownership of [the company]."

[4] The settlement agreement included a handwritten addition here, initialed by both the plaintiff and the defendant, stating that $25,000 of the $200,000 "shall be held in escrow by the mediator, to be distributed to [the defendant] upon completion of the transfer of phone number 203-329-3878 to [the plaintiff]." This addition is not at issue in this appeal.

[5] The provision, in relevant part, provides as follows: "In addition, [the defendant] shall deliver, to the extent he has possession . . . custody or control, all customer lists, contracts, vehicle titles, passwords, computer

codes, computer discs and sticks and backups, accounts, telephone equipment, files, books of account, bank records, correspondence, invoices, purchase orders, receipts and any and all other records, accounts, documents, or tangibles, without limitation, which are proprietary to [the company]; and [the defendant] shall not retain originals or copies of said items, whether such said copies are in electronic or any other form. The [company] telephone numbers and services, 203-329-3878, presently located at 31 Laurel Ledge Rd., Stamford, CT 06903, as well as telephone number 203-324-9961, shall be immediately (within one (1) business day) transferred to 79 Hardesty Rd., Stamford, CT 06903, and [the defendant] shall not use these numbers or services for any purpose whatsoever; password to the time clock; passcode to reprogram security system at Diaz garage; IP Address and password to the West Ave. camera system; IP Address and password to camera system at Diaz Garage; any other needed passwords; the key schedule for Diaz building that [the defendant] took with him when he left; the two memory [backup] sticks that were used to back up [the company's] system nightly with the information still in them; company navigation in [the defendant's] possession; company digital camera in [the defendant's] possession; newly purchased company I-phone in [the defendant's] wife's possession; company mobile phone in [the defendant's] possession; letter from [the defendant] to credit card company, Sprint and any other company needed, as primary name on account, that he is no longer with the company . . . and that [the plaintiff] is the primary contact on the account; and any other documents needed to facilitate the transition."

[6] The provision includes the following, in relevant part: "Each Party . . . hereby forever releases, remises, acquits, waives and discharges each other Party . . . from any and all actions, causes of action, suits . . . trespasses, damages . . . claims and demands whatsoever, in law or equity, which against a Party or . . . another Party . . . ever had, now have or hereafter can, shall or may have for, upon or by reason of any matter, cause or thing whatsoever from the beginning of the world to the date of this Agreement arising solely from or related to [the company], except with respect to any breach of this Agreement or the Term Sheet. . . .

"It is understood by each Party that there is a risk that subsequent to the execution of this Agreement, a Party may discover facts different from or in addition to the facts which he now knows or believes to be true with respect to the subject matter of this Agreement . . . . Each Party intends this Agreement to apply to all unknown or unanticipated results, as well as those known and anticipated, except such facts as may have been [wilfully] and intentionally withheld . . . ."

[7] The relevant provision includes the following language: "Each of the Parties . . . agrees that, should a Party breach any of the provisions of this Agreement or the Term Sheet, the non-breaching Party will be irreparably harmed . . . . Nothing shall be construed as prohibiting any non-breaching Party from pursuing or being entitled to any other available redress for such breach or threatened breach including the recovery of damages. . . ."

[8] Diaz Boncap, LLC, was another company jointly owned by the plaintiff and the defendant. Provisions detailing the sale of the defendant's 50 percent interest in that company to the plaintiff were included in both the binding term sheet and the settlement agreement. The plaintiff later withdrew all claims regarding that company, and it is not at issue in this appeal.

[9] The plaintiff testified that "[the defendant] didn't have the readily available funds . . . or he didn't wanna to come out-of-pocket, so he wanted to know what part of his tax burden was attributed to [the company], so if [$]15,000 was attributed . . . to [the company], he would get a check for [$]15,000; because we were fifty-fifty partners, I would take a check for $15,000."

[10] We note that the record of distributions in 2012 from the company to both the defendant and the plaintiff, which was an exhibit at the trial, uphold the plaintiff's testimony as to the disbursements. This record makes no reference to either $8000 or $9000 paid to either the defendant or the plaintiff on August 29, 2012, and it shows that each payment that was made was in equal amounts to each party.

[11] The referee was not asked to make findings regarding the waiver-of-suit provisions to which the defendant refers on appeal, and, thus, he made no such findings.

[12] The referee's first report and second revised report both included the amount of statutory interest awarded to the plaintiff as well as its legal basis.

[13] The referee's second revised report contained factual findings identical to his first report as to the counts of breach of contract and statutory theft

and the underlying facts.

[14] We note that chapter 613 of the General Statutes, §§ 34-100 through 34-242, was repealed, effective July 1, 2017. See Public Acts 2016, No. 16-97, § 110. We refer in this opinion to the statutory provisions in effect at the time of the alleged breach of contract and statutory theft.

[15] We note that, pursuant to *Paulus* v. *LaSala*, 56 Conn. App. 139, 150, 742 A.2d 379 (1999), cert. denied, 252 Conn. 928, 746 A.2d 789 (2000), § 37-3a provides interest to the date final judgment is rendered.

We also note that there is a discrepancy in the trial court's judgment awarding prejudgment statutory interest. The court adopted the referee's finding that the transfer of the defendant's 50 percent interest in the company was not executed until September 7, 2012. However, it awarded prejudgment statutory interest starting from August 29, 2012, the date of the withdrawal, until the date of judgment. On remand, prejudgment interest must be calculated from September 7, 2012, the date on which the defendant breached the contract by failing to provide full consideration to the plaintiff, as agreed to, in the form of a 50 percent membership interest in the company with all of the assets it had on the date the term sheet was signed and agreed to.

[16] See footnote 14 of this opinion.

[17] See footnote 14 of this opinion.

———————————————